1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| LI "DAVID" YI, individually and derivatively in his capacity as a member of WU LIAO, LLC, | <u>CASE NO.</u> |
| *Plaintiff,* | **<u>VERIFIED COMPLAINT</u>** |
| v. | **<u>DEMAND FOR JURY TRIAL</u>** |
| CALEB WANG and JENNIFER LIAO, | |
| *Defendants,* | |
| and | |
| WU LIAO, LLC, | |
| *Nominal Defendant* | |

VERIFIED COMPLAINT
(Case No.            )

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

**TABLE OF CONTENTS**

Page No.

I.    INTRODUCTION .................................................................................1

II.   PARTIES ...........................................................................................2

III.  JURISDICTION ................................................................................2

IV.   FACTUAL BACKGROUND .............................................................3

      A.    Founding and Operation of Wu Liao ..............................3

      B.    XCJ Opens, and then Pivots During the Pandemic .........5

      C.    Wang and Liao Launch a Plan to Cut Out Their Investors.................8

      D.    Wang and Liao Admit, and then Deny, Their Wrongdoing .............11

V.    DEMAND FUTILITY .....................................................................13

VI.   CAUSES OF ACTION .....................................................................14
      COUNT I
      BREACH OF CONTRACT – LLC AGREEMENT (DIRECT) .........................14

      COUNT II
      BREACH OF CONTRACT – LLC AGREEMENT (DERIVATIVE)................15

      COUNT III
      BREACH OF FIDUCIARY DUTY (DIRECT) .................................16

      COUNT IV
      BREACH OF FIDUCIARY DUTY (DERIVATIVE) .......................17

      COUNT V
      BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
      (DIRECT) .................................................................................18

      COUNT VI
      BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
      (DERIVATIVE).........................................................................20

      COUNT VII
      MINORITY SHAREHOLDER OPPRESSION (DIRECT) .................................21

      COUNT VIII

CONVERSION (DERIVATIVE) ........................................................................21
COUNT IX
UNJUST ENRICHMENT (DERIVATIVE) ...................................................22

VII.  PRAYER FOR RELIEF .............................................................................23

VIII. DEMAND FOR JURY TRIAL ....................................................................24

VERIFIED COMPLAINT
(Case No.                    )

ii

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

Plaintiff Li "David" Yi ("Yi"), individually and derivatively in his capacity as a member of Wu Liao, LLC ("Wu Liao" or the "Company") by his undersigned counsel, states the following as his Complaint against Defendants Caleb Wang ("Wang"), and Jennifer Liao ("Liao").

## I.  <u>INTRODUCTION</u>

1.     This case is a textbook example of self-dealing. It involves management trying to cut out the investors who helped build their business in order to convert more profit for themselves. Here, Wang and Liao founded the Company and, through it, opened XCJ (short for Xiao Chi Jie), a restaurant specializing in traditional Chinese street food that they hoped to franchise throughout the Pacific Northwest. They convinced many of their friends, including Yi, to invest in the Company on the basis of XCJ's prospects.

2.     XCJ was a moderate success from its launch until early 2020, when the Covid-19 pandemic effectively shut down in-person dining. To their credit, Wang and Liao pivoted the business, using the Company's resources, name, and goodwill to transform an in-person restaurant into a direct-to-consumer mail-order service for Chinese meal kits. The business took off, and revenues skyrocketed.

3.     In 2021, Wang and Liao decided to focus their time on the direct-to-consumer business. They had one problem, though: the Company owned the business, and the Company had other investors who were entitled to a share of the profits. Rather than reward their investors for helping get the business off the ground, however, they attempted to gut the Company and transfer all of its profitable assets—including XCJ—to a new entity that they owned.

4.     Under the Company's governance documents, a transfer like this required the unanimous consent of <u>all</u> investors—and Yi refused to consent. This did not deter Wang and Liao, who misappropriated the business and transferred it to a new entity called The XCJ LLC, with new financial support from an accomplice venture fund, and none of their previous investors.

VERIFIED COMPLAINT                                1
(Case No.                    )

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

5.      Wang and Liao personally—in social media posts, published interviews, and podcast appearances—praised themselves for founding XCJ in 2018, pivoting it during the pandemic, and making it a hugely successful direct-to-consumer enterprise. They omit, however, that they seek to throw their original investors overboard rather than share the wealth.

6.      By this action, Yi seeks a finding that the Company's assets were improperly transferred, return of those assets, and damages measured as a fair share of XCJ's business.

## II.   PARTIES

7.      Plaintiff Li "David" Yi is a Chinese citizen who resides in Singapore. Plaintiff was a shareholder of Wu Liao at all relevant times, and remains one today.

8.      Nominal party Wu Liao, LLC is a limited liability corporation formed under the laws of the State of Washington. It maintains its principal place of business in Bellevue, Washington.

9.      Defendant Caleb Wang is a resident of Bellevue, WA.

10.     Defendant Jennifer Liao is a resident of Bellevue, WA.

## III.   JURISDICTION

11.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

12.     Diversity jurisdiction traditionally has two components: first, there must be complete diversity between the parties such that each defendant is a citizen of a different state (or country) as each plaintiff. Second, the amount in controversy must exceed $75,000.

13.     This second component is readily met: Yi's direct claims are for not less than $3 million, and the derivative claims on behalf of Wu Liao are for not less than $20 million.

14.     The facts of this case satisfy the first prong as well: Yi is a Chinese citizen and resident of Singapore. Defendants Wang and Liao are both residents of the state of Washington.

15.     While Nominal party Wu Liao is a Washington LLC, it may avail itself of a well-settled exception to the complete diversity requirement in derivative cases where the company's management is adverse to the shareholder plaintiff.

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

16.     Here, Defendants Wang and Liao control the board and operations of Wu Liao, and are the principal wrongdoers who orchestrated the scheme to strip the Company of all its valuable assets. Accordingly, they are antagonistic to Plaintiff's interests. *See In re Digimarc Corp. Deriv. Litig.*, 549 F.3d 1223, 1235 (9th Cir. 2008) (noting antagonism is present where management has a "stranglehold over the corporation [and] are the people against whom suit is sought to be brought") (internal citations omitted).

17.     Because antagonism exists, Wu Liao is properly considered a defendant for purposes of establishing diversity jurisdiction. Section 1332's diversity requirement is therefore satisfied, with the plaintiff being a foreign national and resident and each defendant (actual or nominal) being at home in Washington state.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all Defendants reside in this judicial district.

## IV.   FACTUAL BACKGROUND

### A.     Founding and Operation of Wu Liao

19.     Plaintiff Li "David" Yi grew up in Washington after his family moved there when he was 9 years old. He attended elementary and middle school in Tacoma and went to high school in Bellevue. While in high school, he met and became friends with Defendant Jennifer Liao.

20.     After high school, Yi went to Duke University while Liao went to the University of Pennsylvania. They reconnected after college when they both were working in New York City. By that time, Liao had met and begun dating Defendant Caleb Wang, who had earned a finance degree from Carnegie Mellon University.

21.     Wang and Liao became business partners as well as romantic ones (they ultimately got married). The two formed Wu Liao in or around February 2017. Their stated plan was to open a high quality "fast casual" Chinese street food restaurant in Bellevue, Washington that they could later franchise throughout the Pacific Northwest. Calling back to their shared cultural heritage, they chose to name the restaurant XCJ, short for Xiao Chi Jie, a Cantonese phrase meaning "street food avenue."

VERIFIED COMPLAINT
(Case No.          )

3

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

22.     Wang and Liao asked friends and family to invest in the business to get it off the ground. In light of Yi's long friendship with Liao and his finance background, he was someone the Defendants were eager to bring on board.

23.     For example, in a spring 2017 text message exchange with Yi, Liao said that if he invested, the "[u]pside is higher than [the] downside," that he was unlikely to lose money "because that would involve the company losing money," and that they would "do everything to protect [his] money as well as [theirs]." She also emphasized that her expectation of positive returns was based on a "conservativ[e]" model that did not account for "online delivery or catering . . . which could be huge." Liao reinforced this point over email in April 2017, indicating that "online ordering channels" and "large catering deals" were "free options" that could yield massive upside.

24.     The pitch made two things crystal clear: first, that Yi's investment would be for a restaurant that they would later try to franchise; and second, that online delivery was also a potential "huge" source of profit.

25.     On August 16, 2017, Yi invested $20,000 into the Company and became a "Class A" member of Wu Liao. He made an additional $50,000 investment on March 11, 2018. These two investments gave him 560 membership units in the Company and a 5.6% stake in its economics. A copy of Wu Liao's Amended Operating Agreement (the "LLC Agreement") is attached as **Exhibit 1**.

26.     The LLC Agreement states that Wu Liao was formed "to license certain intellectual property and run a single location of a larger franchise restaurant." Ex. 1 at ¶ A.1. The LLC's members are divided into two categories: "Class A" and "Class B." Class A members are outside investors like Yi, and the Class B investors are the Company's founders and certain employees. *Id.* at Exhibit A. On most issues, only the Class B members have voting rights, and the "Managers" (Wang, Liao, and their friend Norman Wu) run the day-to-day operations of the Company. *Id.* §§ 4.6, 5.2, 5.4.

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

27.     Section 4.6 of the LLC Agreement, however, lists various exceptions to this general rule. It guarantees that all Members, Class A and B alike, have a vote on key decisions like mergers (§ 4.6.1), amending the LLC Agreement (§ 4.6.2), dissolution (§ 4.6.9), and the decision to "[s]ell, lease exchange or otherwise dispose of all, or substantially all, of the [Company's] property, other than in the ordinary course of the [Company's] activities or activities of the kind carried on by the [Company]" (§ 4.6.10), or to "[u]ndertake any other act outside the ordinary course of the [Company's] activities." (§ 4.6.11).

28.     While most decisions put to the Members require the approval of just a majority of the Members allowed to vote (§ 4.7), those listed in Section 4.6—which go to the fundamental operation and existence of the Company—require the consent of "*all the Members* (i.e., Members holding Class A and B Units)" (§ 5.5) (emphasis added).

29.     Based on the plain language of the LLC Agreement, Yi reasonably believed that a vote requiring the approval of "all the Members" meant exactly that—the unanimous consent of all Class A and B members. He also reasonably believed that if Wang and Liao tried to loot the Company by "dispos[ing] of all, or substantially all" of Wu Liao's assets into a new entity they controlled, a single "no" vote by any Member could derail their plan. What he did not anticipate was that Wang and Liao would simply ignore a "no" vote and loot the Company anyway.

**B.      XCJ Opens, and then Pivots During the Pandemic**

30.     Through Wu Liao, XCJ opened its first—and ultimately only—brick and mortar location in 2018 in Bellevue, WA. The restaurant specialized in pan-fried *shengjianbao* dumplings.

31.     XCJ's first full year of business was 2019. It generated roughly $70,000 in profits (which Wang described in an April 28, 2020 investor letter as "significantly profitable"), with sales ranging from $1,300 to $3,500 per day. As new fast casual restaurants go, it was a success.

32.     And then the pandemic struck.

33.     As one of the first U.S. areas ravaged by COVID-19, King County saw the economic damage wrought by the pandemic earlier than most. Stores shut down, people fled the

area, and in-person dining became essentially nonexistent starting in the spring of 2020. Since XCJ was not set up to take online orders or do delivery at the time, its revenue dropped from approximately $1100 per day in February 2020 to zero by the first week of April. Unless something changed fast, XCJ was doomed.

34.    On April 28, 2020, Wang emailed the XCJ investors to report on just such a change: he indicated in the very first sentence of his email that his goal was to give XCJ's investors "an update on the business given COVID, the ***steps we took to pivot the business***, and [the] financial profile so far" (emphasis added).

35.    In a section of the email entitled "Our COVID Response – Frozen XLB," Wang outlined that pivot as follows:

- "We prioritized health and safety and shut down the store for a month."

- "During this time, we brainstormed paths forward adapting to a COVID world and decided on selling frozen XLB bags marketed as a steam at home kit." XLB stands for *xiaolongbao*, which are soup dumplings very similar to the *shengjianbao* dumplings XCJ focused on in its storefront.

- "Since we started on April 14th – demand has been strong so far 2 weeks in, enough to bring us back to profitability and revenues are now in line with pre-covid levels. Importantly, this business is more profitable than our in-store dining due to the efficiency of labor."

- "We have never really had a real web presence but in the past few weeks, we have setup online ordering for frozen as well as started testing Insta / FB / Pinterest ads. Some pilot tests the last few days are returning 20x ROAS [return on ad spend] so we [are] cautiously optimistic there is more room to run on this frozen line."

36.    These frozen mail order kits were sold under the XCJ brand and were similar to the products that could be ordered at the restaurant, points made abundantly clear in XCJ's Facebook ads announcing the mail order business:



37.     In other words, to save the business Wang and Liao had built using their investors' funds, they pivoted XCJ to do the very thing—"online delivery"—that Liao told Yi "could be huge." And it was.

38.     Wang's email went on to lay out several "Potential Financial Scenarios Post-Covid."  He noted that the principal "areas of uncertainty" were "how well **our frozen bag business can grow in the interim** and how much demand is sustainable" and "how much revenues [*sic*] we will get for in store once we come back online" (emphasis added).

39.     Wang's email ended on a positive note and highlighted the immense opportunity that XCJ's pivot represented for the Company's investors:

> *Net net, we are viewing COVID as a net beneficiary for the business longer term as it has forced us to ramp up a new high margin product line that has a real shot of becoming a big part of the business going forward*.

40.     Wang's private communications at the time were more measured, but still quite optimistic. On April 25th, Wang confirmed to Yi via text message that while the Company was not making any payouts because it was "covid dead," revenues "since we rotated to frozen" had "stemmed the bleeding," giving the Company "infinite runway now."

41.     Li was also told that Defendants applied for pandemic loan from the federal government as well as pandemic-related grants from Amazon and Facebook, and, on information and belief, received and used those funds to pivot the Company.

42.     After receiving these messages, Yi was pleased. He believed that management was safeguarding his investment by taking the recipes and products developed for the Company/XCJ and finding new ways to market them. He was also satisfied at Wang and Liao's responsiveness to his inquiries at the time, as they were being transparent with him about the extreme difficulties that arose as a result of the pandemic, and how they were pivoting not only to address them but also to make the business more profitable than ever.

43.     This transparency, however, was not to last.

C.     **Wang and Liao Launch a Plan to Cut Out Their Investors**

44.     While XCJ's direct-to-consumer business thrived during 2020 and 2021, and XCJ's website was frequently updated with information about its frozen product delivery options, Wang and Liao communicated much less frequently with their investors. Indeed, their next substantial email update to the Company's investors took place on March 19, 2021, almost a full year after they first announced XCJ's pivot. It made only two key points: that XCJ has "managed to continue the good traction since [its] last update on the frozen dumplings which has allowed our business to do quite well last year despite in-store traffic being down ~70%", and that they are "pleased to be able to distribute 66% of your initial capital back in 2020 despite the pandemic."

45.     Yi was confused by how short and terse the email was. Given the surprise success of XCJ during the pandemic, he expected a fuller description of the business and of

VERIFIED COMPLAINT
(Case No.             )

8

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

management's plans for the future. Even so, he did not think at the time that Wang or Liao had started working against the other investors.

46.     That changed at the end of the year. On December 23, 2021, Wang emailed the Company's investors "with a quick update on XCJ."  He told them to "expect a full return of capital by the end of 2021," and disclosed that:

> [W]e are doing some overdue entity clean up work to properly separate this restaurant, other restaurants, and online into their respective spots. Will send over some docusigns [*sic*] over the next week—it would be extremely helpful to get this signed as we would love to get these done before year end for tax purposes.

47.     What Wang ultimately sent over in January 2022, however, were not "clean up" documents. They were instead revised organizational documents designed to place the entirety of the direct-to-consumer business—the only profitable part of the Company—solely in the hands of Wang, Liao, and their chosen insiders. Copies of these materials are attached as **Exhibit 2**.

48.     The first document was styled a "Joint Action by ***Unanimous*** Written Consent of the Managers and Members of Wu Liao, LLC" (emphasis added)—thus indicating that the corporate actions Wang and Liao wanted to take fell within § 4.6 of the LLC Agreement and required the consent of ***all*** Class A and Class B members.

49.     The action the consents purported to authorize would proceed in three steps.  First, the Company's members would create a wholly-owned subsidiary of Wu Liao named The XCJ LLC ("Opco"), and transfer "all of the assets used by the Company in its direct-to-consumer business" to Opco. These assets were listed on an attached Exhibit A, and included the Company's "Recipes and cooking techniques," the trademark registration for XCJ, the XCJ website, the lease agreement for the restaurant, and all of the restaurant equipment used by the restaurant (and their related financing agreements)—in other words, all of the Company's valuable assets, period, leaving it with virtually nothing. In exchange, the members would receive 100% of the membership interests in Opco.

9

50.     Second, the Company would create another wholly-owned subsidiary called XCJ FT LLC ("Holdco"). The Company would transfer its entire interest in Opco to Holdco in exchange for 100% of the membership interests in Holdco. In short, after Step Two, the Company would own Holdco, and Holdco would own Opco, which would own and operate the business.

51.     Third, the Company would "distribute 100% of the membership interests in Holdco to certain of the Members in accordance with" an attached distribution agreement. Those members were Wang, Liao, Norman Wu, Brian Yong, and Danny Brawer, collectively referred to as the XCJ Founders.

52.     Step Three shocked Yi. It was apparent that Wang, Liao, and the others decided amongst themselves that the Company's other investors should not share in the potential "infinite runway" presented by the direct-to-consumer business that they had touted the previous year.

53.     Under Sections 4.6 and 5.5 of the LLC Agreement, however, none of these steps could happen absent unanimous consent because they involved the disposition of "all or substantially all" of the Company's property, and fell outside the ordinary course of business.

54.     Yi refused to give his consent, though he understands that others did. Wang and Liao moved forward anyway, supported by a new private equity partner.

55.     Because of Wang and Liao's actions, the Company now has virtually no assets. XCJ's Opco (now branding itself as Eat Mila) advertises heavily across social media for nationwide delivery of its at-home dumpling kits. As of February 2023, Opco had sold approximately 20 million dumplings. At a price point of $42 per bag of 50 frozen dumplings, that amounts to $16.8 million in revenue from dumplings alone (excluding the other products sold via mail order) since the start of the pandemic—a far cry from the less than $3,500/day in sales the company made in 2019.

56.     According to Forbes, XCJ's annual revenue increased fivefold between 2020-2021, and grew at a similar pace in 2022. Projecting out for 2023, Opco will likely sell 100 million dumplings this year for revenues on that product of $84 million. Adding in additional sales from other existing products and new products Opco has announced it plans to introduce

VERIFIED COMPLAINT                                    10                    Cotchett, Pitre & McCarthy, LLP
(Case No.                    )                                                        999 N. Northlake Way, Suite 215
                                                                                       Seattle, WA 98103
                                                                                       Telephone: (206) 802-1272
                                                                                       Facsimile: (650) 697-0577

(estimated to represent 25% of all sales), Opco likely will realize $105 million in revenue during 2023.

57.     Absent judicial relief, the Company—and Yi—do not and will not see a dime of that revenue.

**D.     Wang and Liao Admit, and then Deny, Their Wrongdoing**

58.     One constant throughout Yi's dispute with Wang and Liao is that the latter would change their story, and their explanations for their actions, depending on what suited them at any given moment.

59.     For example, during the pandemic, and as explained above, Wang and Liao touted the success of their pivot to a direct-to-consumer business to their investors, which was "enough to bring *us* back to profitability" and become "more profitable than *our* in-store dining" (emphasis added). They projected how "the business" would do "post-Covid," and modeled several scenarios involving both frozen sales and in-store dining because it was an open question "how well *our* frozen bag business can grow" and "how much revenues [sic] *we* will get for in store once *we* come back online" (emphasis added). They concluded that "[n]et net, we are viewing COVID as a net beneficiary for the business longer term."

60.     This story remained consistent through the beginning of the Opco Era. A February 23, 2022 article in Success Magazine noted that at the beginning of the pandemic, "XCJ was forced to close indoor dining and pivot. Wang quit his full-time job in finance to focus all of his time and energy on helping XCJ survive." Liao is quoted in the article as saying "[w]e knew the best way to stay connected to our customers and keep our staff employed was to start freezing our dumplings." She further explained that going into 2022, "[d]espite scaling up, we have made it an imperative point not to change any of the processes that made the original version [of the dumplings] great." The article noted, almost in passing, that XCJ still operates one small restaurant in a mini food court, but commented that the "direct-to-consumer business brings in

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

10 times the revenue."[1] In other words, Wang and Liao were still clear that the direct-to-consumer business was part of the Company, and was indeed responsible for saving the Company during the pandemic.

61.     In the spring of 2022, Yi told Wang and Liao that their transfer of corporate assets out of the Company was improper because it was not authorized by unanimous consent. Their private communications with Yi notwithstanding, Wang and Liao continued to give interviews characterizing the direct-to-consumer business as a pivot of the restaurant instead of as an entirely new business line.

62.     For example, on the "Story of a Brand" podcast episode dated May 20, 2022, they admit that the direct-to-consumer business was born out of necessity during the pandemic, and that they decided to expand to nationwide delivery after achieving local success.

63.     Likewise, they were both featured on the June 14, 2022 podcast episode of "Startup to Storefront," where they characterized the mail order business as an experiment during the pandemic to keep their restaurant workers employed. They admitted that the same chef employed by the restaurant—Bryan Yong, whom Yi had known since middle school—develop their consumer packaged goods. In other words, Wang and Liao used the funding, equipment, employees, and resources of XCJ to develop the direct to consumer business.

64.     By September, however, they had changed their tune. Wang and Liao appeared on the September 27, 2022 "Young Influential" podcast. They spoke very little about the pandemic, especially compared to prior interviews, and appeared coached to avoid certain topics. And they rebranded the business to "Eat Mila" to conceal any connection to the Company.

65.     The direct-to-consumer business was a pivot of the existing restaurant business, developed using existing restaurant resources, and was supported by the restaurant's existing goodwill. As a result, Wang and Liao have no basis to deny the Company (and by extension, Yi) its rightful share of Opco's business.

---

[1] *See* https://www.success.com/these-asian-american-entrepreneurs-celebrate-their-chinese-heritage-while-feeding-americas-appetite-for-chinese-street-food/

V.   **DEMAND FUTILITY**

66.     Plaintiff, through counsel, contacted counsel for XCJ and the Defendants several times to raise the concerns addressed herein. This included multiple emails, letters, phone calls, and videoconferences between Plaintiff's counsel at Harris St. Laurent & Wechsler LLP and corporate counsel at Holland & Hart LLP and, later, Defendants' litigation counsel at Fenwick & West LLP. These communications took place throughout the first half of 2022. All such efforts to convince Defendants—who ran both the Company and XCJ—that they did not have appropriate shareholder approval to transfer the Company's assets failed.

67.     Additionally, Plaintiff contacted the venture capital firm backing XCJ, Imaginary Ventures, in April 2022 to alert it to Defendants' failure to obtain shareholder approval for the asset transfer transactions.  After several phone calls and email exchanges, Imaginary Ventures informed Plaintiff that it agreed with Defendants' position that the transfer was proper.

68.     Accordingly, the Company's board is not disinterested because its key members stand on both sides of the challenged transactions. Demand upon the Company is thus excused as futile because the very individuals at the board level who would be charged with deciding whether to sue to enforce the Company's rights—Wang and Liao—are the principal wrongdoers here.

69.     Plaintiff would fairly and adequately represent the interests of the Company and any other similarly-situated shareholders (of which, on information and belief, there are none) in enforcing the Company's rights.

VERIFIED COMPLAINT
(Case No.                    )                                    13                    Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

## VI.   CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT – LLC AGREEMENT

### (DIRECT)

70.     Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

71.     The Company is governed by an LLC Agreement that was signed by, among others, Defendants and Yi. The Company's members are divided into Class A (outside investors like Yi) and Class B (founders including Wang and Liao). On most issues, only the Class B members have voting rights. *Id.* §§ 4.6, 5.2, 5.4.

72.     Section 4.6 of the LLC Agreement lists various exceptions to this general rule. It guarantees that all Members, Class A and B alike, have a vote on key decisions like mergers (§ 4.6.1), amending the LLC Agreement (§ 4.6.2), dissolution (§ 4.6.9), and the decision to "[s]ell, lease, exchange or otherwise dispose of all, or substantially all, of the [Company's] property, other than in the ordinary course of the [Company's] activities or activities of the kind carried on by the [Company]" (§ 4.6.10), or to "[u]ndertake any other act outside the ordinary course of the [Company's] activities." (§ 4.6.11).

73.     The decisions listed in Section 4.6 require the consent of "all the Members (i.e., Members holding Class A and B Units)" of Wu Liao to become effective (§ 5.5).

74.     The decision to transfer all of the Company's assets to Opco, create Holdco to own Opco, and vest ownership and control of Holdco exclusively in the hands of Wang, Liao, and other insiders was a decision to dispose of all or substantially all of the Company's assets, and was outside the normal course of the Company's business.  It therefore required the unanimous consent of Class A and Class B members alike.

75.     Yi refused to give his consent and outright objected to the plan. Wang and Liao moved forward with the transfers anyway, stripping the Company of virtually all of its assets.

VERIFIED COMPLAINT                              14                    Cotchett, Pitre & McCarthy, LLP
(Case No.                    )                                        999 N. Northlake Way, Suite 215
                                                                     Seattle, WA 98103
                                                                     Telephone: (206) 802-1272
                                                                     Facsimile: (650) 697-0577

76.     As a result of these breaches, Yi has been damaged in an amount to be determined at trial, but not less than $3 million.

## COUNT II

## BREACH OF CONTRACT – LLC AGREEMENT

## (DERIVATIVE)

77.     Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

78.     The Company is governed by an LLC Agreement that was signed by, among others, Defendants and Yi. The Company's members are divided into Class A (outside investors like Yi) and Class B (founders including Wang and Liao). On most issues, only the Class B members have voting rights. Id. §§ 4.6, 5.2, 5.4. Under Washington law, the Company is bound by and entitled to enforce the LLC Agreement (or, alternatively, and at a bare minimum, is a third-party beneficiary of the LLC Agreement).

79.     Section 4.6 of the LLC Agreement lists various exceptions to this general rule. It guarantees that all Members, Class A and B alike, have a vote on key decisions like mergers (§ 4.6.1), amending the LLC Agreement (§ 4.6.2), dissolution (§ 4.6.9), and the decision to "[s]ell, lease, exchange or otherwise dispose of all, or substantially all, of the [Company's] property, other than in the ordinary course of the [Company's] activities or activities of the kind carried on by the [Company]" (§ 4.6.10), or to "[u]ndertake any other act outside the ordinary course of the [Company's] activities." (§ 4.6.11).

80.     The decisions listed in Section 4.6 require the consent of "all the Members (i.e., Members holding Class A and B Units)" of Wu Liao to become effective (§ 5.5).

81.     The decision to transfer all of the Company's assets to Opco, create Holdco to own Opco, and vest ownership and control of Holdco exclusively in the hands of Wang, Liao, and other insiders was a decision to dispose of all or substantially all of the Company's assets, and

VERIFIED COMPLAINT
(Case No.                    )
15
Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

was outside the normal course of the Company's business.  It therefore required the unanimous consent of Class A and Class B members alike.

82.    Yi refused to give his consent and outright objected to the plan. Wang and Liao moved forward with the transfers anyway, stripping the Company of virtually all of its assets.

83.    As a result of these breaches, the Company has been damaged in an amount to be determined at trial, but not less than $20 million.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**

**(DIRECT)**

84.    Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

85.    As managers and controlling members, Wang and Liao owed fiduciary duties to Yi as a minority member of the Company, which was closely-held and in which Yi had limited voting rights. These duties are limited by the LLC Agreement. Their liability under the duty of care extends to "refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law." Their liability under the duty of loyalty purports to extend only to "refraining from engaging in fraud or deceit."

86.    Wang and Liao engaged in intentional misconduct because they stood on both sides of a conflicted transaction that was not approved by the shareholders of the Company and that enriched them at the Company's expense—in other words, self-dealing. They also deceived (or attempted to deceive) the members of the Company, including Yi, by falsely describing the origins of the mail-order business (which they define as the "DTC Business") in the proposed Distribution Agreement. That document states that Wang and Liao and other insiders "have been operating the DTC Business through [the Company], although the intent of [them and the other insiders], [the Company], and [the Company's] other members was and is that the DTC Business be a separate entity in which [the Company's] other members have no ownership interest."

VERIFIED COMPLAINT                           16
(Case No.                  )

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

87.     In truth, the DTC Business began as a pivot away from a traditional brick-and-mortar restaurant business that could not operate during the pandemic. Wang and Liao admitted as much in multiple communications to their investors on behalf of the Company.

88.     Wang and Liao had no right to force through a conflicted transaction that benefited themselves and their chosen insiders at the expense of the Company without unanimous consent, which they did not obtain.

89.     By doing so, they breached their fiduciary duties to Yi (and the other minority members) and violated the corporate opportunity doctrine by appropriating to themselves a business opportunity (here, the DTC Business) rightfully belonging to the Company.

90.     As a result of these breaches, Yi has been damaged in an amount to be determined at trial, but not less than $3 million.

91.     Likewise, Yi is entitled to rescission of the contracts conveying its assets to the new Opco/Holdco entities organized by Defendants, and the return to the Company of all assets conveyed via those agreements.

**COUNT IV**

**BREACH OF FIDUCIARY DUTY**

**(DERIVATIVE)**

92.     Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

93.     Defendants, as managing and controlling members, owed fiduciary duties to the Company. These duties are limited by the LLC Agreement. Their liability under the duty of care extends to "refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law." Their liability under the duty of loyalty purports to extend only to "refraining from engaging in fraud or deceit."

94.     Wang and Liao engaged in intentional misconduct because they stood on both sides of a conflicted transaction that was not approved by the shareholders of the Company and that

enriched them at the Company's (and its shareholders') expense—in other words, self-dealing. They also deceived (or attempted to deceive) the members of the Company, including Yi, by falsely describing the origins of the DTC Business in the proposed Distribution Agreement. That document states that Wang and Liao and other insiders "have been operating the DTC Business through [the Company], although the intent of [them and the other insiders], [the Company], and [the Company's] other members was and is that the DTC Business be a separate entity in which [the Company's] other members have no ownership interest."

95.    In truth, the DTC Business began as a pivot away from a traditional brick-and-mortar restaurant business that could not operate during the pandemic. Wang and Liao admitted as much in multiple communications to their investors on behalf of the Company.

96.    Wang and Liao had no right to force through a conflicted transaction that benefited themselves and their chosen insiders at the expense of the Company without unanimous consent, which they did not obtain.

97.    By doing so, they breached their fiduciary duties to the Company, and violated the corporate opportunity doctrine by appropriating to themselves a business opportunity (here, the DTC Business) rightfully belonging to the Company.

98.    As a result of these breaches, the Company has been damaged in an amount to be determined at trial, but not less than $20 million.

99.    Likewise, the Company is entitled to rescission of the contracts conveying the Company's assets to the new Opco/Holdco entities organized by Defendants, and the return to the Company of all assets conveyed via those agreements.

COUNT V

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(DIRECT)**

100.    Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

VERIFIED COMPLAINT                           18            Cotchett, Pitre & McCarthy, LLP
(Case No.                )                                999 N. Northlake Way, Suite 215
                                                         Seattle, WA 98103
                                                         Telephone: (206) 802-1272
                                                         Facsimile: (650) 697-0577

101.   As with all contracts, the LLC Agreement is subject to an implied covenant of good faith and fair dealing that cannot be—and is not here—disclaimed. Under Washington law, this duty obligates parties to a contract to cooperate with each other so that each may obtain the full benefit of performance.

102.   Defendants and Yi were parties to the LLC Agreement that governed the operations of the Company. These obligations included, among other things, that the corporate actions in Section 4.6 proceed only on the unanimous consent of all the Company's members, and that Defendants not engage in reckless or intentional misconduct, commit acts of fraud or deceit, or conduct illegal activity.

103.   Under Washington law, the Company is bound by and entitled to enforce the LLC Agreement (or, alternatively, and at a bare minimum, is a third-party beneficiary of or real party in interest of the LLC Agreement).

104.   The Company pivoted its business model during the pandemic to survive, rolling out the DTC Business to replace the revenue lost by the end of in-person dining.  The assets related to the DTC Business became the Company's principal—and valuable—assets.

105.   By transferring these assets to Opco without the unanimous consent of all members—after informing the members, including Yi, that they were seeking the required unanimous consent—Defendants acted in bad faith and denied the investors their ability to obtain the full benefit of their investments in the Company. This is at a bare minimum reckless, and more accurately intentional, misconduct and self-dealing. They also deceived (or attempted to deceive) the members of the Company by falsely describing the origins of the DTC Business in the proposed Distribution Agreement.

106.   As a result of these breaches, Yi has been damaged in an amount to be determined at trial, but not less than $3 million.

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

## COUNT VI

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (DERIVATIVE)

107.   Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

108.   As with all contracts, the LLC Agreement is subject to an implied covenant of good faith and fair dealing that cannot be—and is not here—disclaimed. Under Washington law, this duty obligates parties to a contract to cooperate with each other so that each may obtain the full benefit of performance.

109.   Defendants and Yi were parties to the LLC Agreement that governed the operations of the Company. These obligations included, among other things, that the corporate actions in Section 4.6 proceed only on the unanimous consent of all the Company's members, and that Defendants not engage in reckless or intentional misconduct, commit acts of fraud or deceit, or conduct illegal activity.

110.   The Company pivoted its business model during the pandemic to survive, rolling out the DTC Business to replace the revenue lost by the end of in-person dining.  The assets related to the DTC Business became the Company's principal—and valuable—assets.

111.   By transferring these assets to Opco without the unanimous consent of all members—after informing the members, including Yi, that they were seeking the required unanimous consent—Defendants denied Yi the ability to obtain the full benefit of his investment in the Company. This is at a bare minimum reckless, and more accurately intentional, misconduct and self-dealing. They also deceived (or attempted to deceive) the members of the Company, including Yi, by falsely describing the origins of the DTC Business in the proposed Distribution Agreement.

112.   As a result of these breaches, the Company has been damaged in an amount to be determined at trial, but not less than $20 million.

VERIFIED COMPLAINT
(Case No.                    )                    20                    Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

## COUNT VII

## MINORITY SHAREHOLDER OPPRESSION

## (DIRECT)

113.  Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

114.  Wang and Liao were and are directors of the Company and control a majority of its voting rights. They accordingly have an obligation under Washington law to refrain from acting in a manner that is "illegal, oppressive, or fraudulent" towards the Company's minority shareholders (including Plaintiff).

115.  Defendants engaged in oppressive conduct by stripping all of the Company's valuable assets away and transferring them to a separate entity they controlled, without the required unanimous consent of the Company's minority shareholders, who were cut out of this new entity.

116.  These actions defied the reasonable expectations of Yi and the other minority shareholders because it violated their basic understanding that, as investors, they would share in the Company's success, pivot or no pivot.

117.  They also constituted "burdensome, harsh and wrongful conduct," and demonstrated a lack of "probity and fair dealing." Defendants plundered the Company to enrich themselves at the expense of the minority shareholders.

118.  As a result of Defendants' oppressive tactics, Yi has been damaged in an amount to be determined at trial, but not less than $3 million.

## COUNT VIII

## CONVERSION

## (DERIVATIVE)

119.  Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

VERIFIED COMPLAINT
(Case No.              )                              21                    Cotchett, Pitre & McCarthy, LLP
                                                                            999 N. Northlake Way, Suite 215
                                                                            Seattle, WA 98103
                                                                            Telephone: (206) 802-1272
                                                                            Facsimile: (650) 697-0577

120.   The Company's direct-to-consumer business was a valuable asset—both in terms of intellectual property and business opportunity—owned by the Company for the benefit of all of its members.

121.   Defendants violated the common law rules against conversion by taking all of the Company's valuable assets for themselves and transferring them to a new entity owned exclusively by them and their chosen insiders. They had no right to do so without the unanimous consent of the Company's members, which they did not receive.

122.   At all times, it was the intent of Defendants to deprive the Company and its outsider investors, like Yi, of the valuable opportunity afforded by the pivot to a direct-to-consumer business.

123.   As a result of this intentional wrongdoing, the Company has been damaged in an amount to be determined at trial, but not less than $20 million.

**COUNT IX**

**<u>UNJUST ENRICHMENT</u>**

**<u>(DERIVATIVE)</u>**

124.   Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

125.   This claim is plead as an alternative to Count I, the contract claim.

126.   The Company's direct-to-consumer business was a valuable asset—both in terms of intellectual property and business opportunity—owned by the Company for the benefit of all of its members.

127.   As with all parts of the Company's business, it was funded by the contributions of its member investors, including Yi.

128.   As an investor, Yi had a reasonable expectation that he would share in 5.6% of the Company's economics.

129.   By taking the DTC Business for themselves, Wang and Liao unjustly deprived the Company of the substantial revenues that it would generate, of which Yi was entitled to 5.6%, and were unjustly enriched.

130.   Equity and good conscience demand that these revenues be returned to the Company.

131.   As a result of Defendants' inequitable conduct, the Company has been damaged in an amount to be determined at trial, but not less than $20 million.

132.   Likewise, the Company is entitled to rescission of the contracts conveying its assets to the new Opco/Holdco entities organized by Defendants, and the return of all assets conveyed via those agreements.

## VII.   PRAYER FOR RELIEF

133.   Plaintiff respectfully request a judgment awarding:

(a)     Compensatory damages to the Company in an amount to be determined at trial, but not less than $20 million;

(b)     Compensatory damages to Yi directly in an amount to be determined at trial, but not less than $3 million;

(c)     Rescission of all agreements conveying the Company's assets to Opco/Holdco and/or their respective members; and

(d)     Granting such other relief, including interest, as may be just and appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

DATED:          June 23, 2023
                Seattle,  Washington

Respectfully submitted:

/s/ Karin B. Swope
KARIN B. SWOPE
Karin B. Swope (WSBA # 24015)
kswope@cpmlegal.com
Galen K. Cheney (WSBA # 56023)
gcheney@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272


/s/ Joseph T. Gallagher
JOSEPH T. GALLAGHER
Joseph T. Gallagher (*pro hac vice* forthcoming)
jgallagher@hs-law.com
David B. Wechsler (*pro hac vice* forthcoming)
dwechsler@hs-law.com
**HARRIS ST. LAURENT & WECHSLER LLP**
40 Wall Street, 53rd Floor
New York, NY 10005
T: (212) 397-3370


*Attorneys for Plaintiff Li "David" Yi*

## **VERIFICATION**

I, Li "David " Yi, a Chinese citizen and a resident of Singapore, hereby declares under penalty of perjury pursuant to 28 U.S. C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this ___23___ day of June, 2023.

_____
Li "David" Yi, Plaintiff

VERIFIED COMPLAINT
(Case No.                    )

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

# EXHIBIT 1

---

**AMENDED OPERATING AGREEMENT**

**WU LIAO, LLC,**
**A WASHINGTON LIMITED LIABILITY COMPANY**

---

This Amended Operating Agreement of Wu Liao, LLC ("Company") is entered into and effective July 27, 2017 ("Effective Date") by and between the undersigned members ("Members") listed on Exhibit A of this Agreement, and constitutes the new agreement to govern the operation and ownership of Wu Liao, LLC, pursuant to the 2016 Washington State Limited Liability Act, RCW 25.15.

## A. <u>RECITALS</u>

1. The initial members, who previously formed Wu Liao, LLC to license certain intellectual property and run a single location of a larger franchise restaurant, and executed an initial Operating Agreement, now seek to sell a non-voting, non-management, equity-only, minority membership interest in the Company in exchange for capital investments, and execute an Amended Operating Agreement that sets out the new rights and responsibilities of all members.

2. The Members hereby adopt and approve of the attached certificate of formation of the Company filed with the Washington Secretary of State.

3. The Members having, individually, the appropriate financial sophistication, as well as personal access to all relevant financial disclosure information, to engage in a private isolated transaction of this nature, enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.


THEREFORE, in exchange for the good an valuable consideration discussed herein, the Members hereby agree to the above and to the following:

## B. <u>AGREEMENT</u>

**1. Definitions.**

When used in this Agreement, the following terms shall have the meanings set forth below (all capitalized terms used in this Agreement that are not defined in this <u>Section 1</u> shall have the meanings set forth elsewhere in this Agreement):

**1.1** "**Act**" means the Washington Limited Liability Act of 2016.

**1.2** "**Agreement**" means this Amended Operating Agreement of the Company, as amended from time to time.

**1.3** "**Certificate**" means the Certificate of Formation for the Company originally filed with the Washington Secretary of State, as amended from time to time.

**1.4** "**Bankruptcy**" means (a) the filing of an application by a Member for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his or her debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his or her inability to pay his or her debts as they become due.

**1.5** "**Book Value**" shall mean, as of any particular date, the value at which the Company's assets are properly reflected on the books of the Company as of such date in accordance with the provisions of Regulations Section 1.704-1(b). The Book Values of all Company assets shall, if the Manager in its sole discretion deems it appropriate, be adjusted to equal their respective gross fair market values, as determined by the Manager, at the times specified in those regulations.

**1.6** "**Capital Account**" means, with respect to any Member, the capital account that the Company establishes and maintains for such Member pursuant to Section 3.5.

**1.7** "**Capital Contribution**" means, with respect to any Member, the total value of (1) cash and the fair market value of property other than cash and (2) services that are contributed and/or agreed to be contributed to the Company by such Member, as listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement.

**1.8** "**Class**" shall have the meaning set forth in Section 3.1.

**1.9** "**Class A Percentage Interest**" and "**Class B Percentage Interest**" shall have the respective meanings set forth in Section 3.1.

**1.10** "**Distributable Cash**" means the amount of cash from the Company's operations and business activities available for distribution to the Members, taking into account all Company debts, liabilities, projected operational needs, and obligations of the Company then due or anticipated and amounts that the Manager deems necessary to place into reserves for customary and usual claims and reserves with respect to the Company's business.

**1.11** "**Economic Interest**" means a Member's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement.

**1.12** "**Fiscal Year**" means the Company's fiscal year, which shall be the calendar year.

**1.13** "**Laws**" means the Securities Act of the State of Washington, as amended, and any other applicable laws.

**1.14** "**Manager**" means the manager of the Company acting pursuant to Section 5.2 from time to time.

2

**1.15** "**Member**" means each Person who (a) is listed as a member of the Company on the attached **Exhibit A**, or (b) becomes a member of the Company in accordance with this Agreement.

**1.16** "**Membership Interest**" means a Member's entire interest in the Company, including the Member's Economic Interest, the right to vote on or participate in the Company's management, and the right to receive information concerning the Company's business and affairs.

**1.17** "**Net Profit**" and "**Net Loss**" means the Company's income, gain, loss, deductions, and credits in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting at the close of each Fiscal Year on the Company's information tax return filed for federal income tax purposes.

**1.18** "**Percentage Interest**" means a Member's undivided percentage economic interest in the Company set forth on **Exhibit A**, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement. A Member's Percentage Interest at any given time shall be determined by dividing the number of Units (of all Classes) owned by such Member at such time by the number of Units (of all Classes) owned by all Members at such time. The names, addresses, Capital Contributions and Percentage Interests of all Members shall be designated in Exhibit A, which is attached hereto. The manager shall cause Exhibit A to be amended from time to time to reflect the withdrawal of one or more Members or the admission of one or more additional Members.

**1.19** "**Person**" means an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust, or any other entity.

**1.20** "**Securities Act**" means the Securities Act of 1933, as amended.

**1.21** "**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

**1.22** "**Transfer**" means:

       (a)     any sale, conveyance, pledge, encumbrance, disposition or other transfer, whether voluntary or involuntary, by operation of law or otherwise, including, without limitation, any disposition occurring by virtue of the bankruptcy or insolvency of a Member, the appointment of a receiver, trustee, conservator or guardian for a Member or a Member's property, a transfer pursuant to the will of a Member or the laws of descent and distribution, a transfer pursuant to court order in the event of divorce, marital dissolution, legal separation or similar proceedings, or a transfer pursuant to any loan or security agreement;

       (b)     with respect to any Member that is a corporation, limited liability company, partnership, or other entity, "**Transfer**" shall include a change in ownership effected voluntarily, involuntarily, or by operation of law of twenty-five percent (25%) or more of the ownership interests such Member currently holds; and.

(c) notwithstanding the foregoing, the term "**Transfer**" does not include a transfer by a Member who is a natural person of his or her Units to any trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's issue if any such persons retain a beneficial interest in the trust.

**1.23** "**Units**" shall have the meaning set forth in <u>Section 3.1.1</u>.

## 2.   <u>Organizational Matters.</u>

**2.1**   <u>Formation</u>.  Pursuant to the Act, the Company has been formed under the laws of the State of Washington with the filing of the Certificate with the Washington Secretary of State. The Members' rights and liabilities shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

**2.2**   <u>Name</u>.  The Company's name is **Wu Liao, LLC**.  The Company's business may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager(s) deems appropriate or advisable.  The Manager(s) shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager(s) considers to be appropriate or advisable.

**2.3**   <u>Term</u>.  The Company's existence shall continue until terminated in accordance with the terms of this Agreement.

**2.4**   <u>Office and Agent</u>.   The Company shall continuously maintain an office and registered agent in the State of Washington as required by the Act.  The Company's principal office shall be located at 208 106th Ave. NE, Bellevue, WA 98004.  The Company also may have such offices, anywhere within and without the State of Washington, as the Manager(s) from time to time may determine, or the Company's business may require.

**2.5**   <u>Purpose of Company</u>.  The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act.

**2.6**   <u>Organizational Expenses</u>.  The Company shall reimburse the Manager(s) for all amounts incurred by them in connection with the formation of the Company and the drafting of this Agreement.

## 3.   <u>Capital Structure.</u>

**3.1**   <u>Ownership Interests.</u>

**3.1.1**   Each Member's ownership interest in the Company shall be denominated by a specific number of units (the "**Units**") which may be adjusted from time to time pursuant to the terms of this Agreement.  The Units shall be divided into separate classes, each with specific rights (each a "**Class**").  Initially there will be two Classes of Units – Class A Units and Class B Units.  Except as otherwise expressly provided in this Agreement, the Class A Units shall not

have any voting rights.  The Class B Units shall have voting rights – one vote for each Unit.  The number of Units owned by each Member as of the Effective Date is set forth on <u>**Exhibit A**</u>.

　　　　3.1.2   Each Member's percentage economic interest in the Company, including, except as may otherwise be provided in <u>Section 6</u>, each item of income, gain, loss, deduction, credit and distributions of the Company, shall be derived from such Member's ownership of Units of each Class.  A Member's percentage interest in each Class of Units shall be calculated by dividing the number of Units of such Class owned by the Member by the total outstanding number of Company Units of that class then outstanding.  Accordingly, (a) the number of Class A Units owned by a Member divided by the total outstanding number of Class A Units then outstanding will be such Member's **"Class A Percentage Interest**;" (b) the number of Class B Units owned by a Member divided by the total outstanding number of Class B Units then outstanding will be such Member's "**Class B Percentage Interest;**"

### 3.2    <u>Issuance of Units</u>.

　　　　3.2.1   The Company shall have the power to issue an unlimited number of Class A and B Units. Prior to the execution of this Agreement, the Company was held equally by its four current members. In this Agreement, the Company creates two classes of Units, in an amount and with a par value as reflected in Exhibit A, and issues them to the new Members in accordance with Exhibit A. Some of these Units have not yet been issued, and may be issued in the sole discretion of, and upon the unanimous agreement of the Managers, without regard to any other provision in the Agreement to the contrary.

　　　　3.2.2   The Company shall have the power to create new and additional Classes of Units with such rights, preferences and privileges as are determined by the Company.

### 3.3    <u>**Initial Capital Contributions.**</u>    Each Member's Capital Contribution as of the Effective Date is set forth on the attached **<u>Exhibit A,</u>** and henceforth shall equal the amount agreed upon herein or, if no value is agreed upon, the value shall be determined based on the records of the limited liability company.  **<u>Exhibit A</u>** shall be revised to reflect any additional contributions contributed in accordance with <u>Section 3.4</u>.

### 3.4    <u>**Additional Capital Contributions.**</u>

　　　　3.4.1   In the event that the Manager determines that additional Capital Contributions are necessary or appropriate for the conduct of the Company's business, the Manager(s) may either arrange for the Company to borrow the necessary funds or may notify the Members of the required additional Capital Contributions and give the Members the opportunity, but not the obligation, to make additional Capital Contributions.

　　　　3.4.2   The notice to the Members shall state the amount of additional capital required, each Member's share, calculated on the assumption that each Member will contribute such Member's pro rata share of the required additional capital, and the number of additional Units that will be issued to Members contributing additional capital equal to the amount agreed upon herein or, if no value is agreed upon, the value shall be determined based on the records of the limited liability company.  The notice shall be given not later than fifteen (15) days prior to the date on which the additional capital is required.  In the event that some of the Members elect

not to contribute their pro rata share of the additional required capital, the other Members shall have the ability to contribute such share, pro rata in accordance with their Percentage Interests within ten (10) days after the date specified in the notice as the due date for the required additional Capital Contributions. Each Member shall receive a credit to such Member's Capital Account in the amount of any additional capital which such Member contributes to the Company, and shall receive such additional Units as are appropriate. In the event that the Members do not contribute the additional required capital, the Manager(s) shall have the right to admit additional Members, and issue Units to such additional Members, pursuant to Section 4.2, and upon such terms and conditions as the Manager(s) shall determine in their sole unanimous discretion, provided they obtain the prior unanimous written consent of the existing Cass B Members.

### 3.5    **Capital Accounts.**

**3.5.1**    A separate Capital Account shall be maintained for each Member strictly in accordance with all applicable laws, rules, or regulations. Subject to the preceding sentence, each Member's Capital Account shall be (i) increased by the amount of Capital Contributions made by such Member to the Company and allocations to such Member of Net Profits and other items of book income and gain; and (ii) decreased by the amount of money and fair market value of property (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Tax Code) distributed to such Member by the Company and allocations to such Member of Net Losses and other items of book loss and deductions; and (iii) otherwise adjusted in accordance with applicable laws, rules, and regulations.

**3.5.2**    In the event the Book Values of Company assets are adjusted pursuant to applicable laws, rules, or regulations, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the allocations of income, gain, loss or deduction that would be made to the Members if there were a taxable disposition of the Company's property for its fair market value. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of their fair market values after the Members' Capital Accounts have been adjusted to reflect the manner in which any unrealized income gain, loss or deduction with respect to such assets (that have not been reflected in the Capital Accounts previously) would be allocated between the Members if there were a taxable disposition of the property for its fair market value.

**3.5.3**    If any interest in the Company is transferred in accordance with the provisions of this Agreement, the transferee Member shall succeed to that portion of the Capital Account of the transferring Member as relates to such transferred interest.

**3.5.4**    It is the intent of the Company that the Capital Accounts of all Members be determined and maintained at all times throughout the full term of the Company, and the foregoing provisions of this Section 3.5 shall be interpreted in accordance with such intention.

### 3.6    **Return of Capital; Partition**.  Except as otherwise provided herein, no Member shall have any right to (a) demand the return of all or any part of such Member's Capital Account during the term of the Company, or (b) receive a return of such Member's Capital Account from any specific assets of the Company. Each Member irrevocably waives any right that such

6

Member may have to cause a partition of all or any part of the Company's assets. No Member shall be entitled to receive any interest with respect to a Capital Contribution.

**3.7    Loans to the Company**. If necessary to pay the Company's expenses or obligations, any Member may lend or advance money to or for the Company's benefit with the approval of the Manager(s). Any such loans shall be segregated in a loans payable account. Except as may be otherwise agreed to by all of the Managers, no interest payable on any such loan shall exceed the lesser of: (i) two percent (2%) per annum in excess of the Prime Rate, or (ii) the highest lawful rate. No such loan shall constitute additional capital or entitle the lending Member to an increased share of the Company's Net Profits, Net Losses, or Distributable Cash.

## 4.    Members.

**4.1    Limited Liability**. Except as required under the Act or as expressly contemplated in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

**4.2    Admission of Additional Members**. The Manager(s) may admit additional Members to the Company, and issue Units to such additional Members, from time to time, in their sole discretion, subject to the following:

**4.2.1**    Each additional Member shall make a Capital Contribution in such amount and on such terms as the Manager(s) reasonably determines to be appropriate based upon the needs of the Company, the net value of the Company's assets, the Company's financial condition, and the benefits anticipated to be realized by the additional Member; and

**4.2.2**    Each additional Member agrees to be bound by the terms of this Agreement.

**4.3    Withdrawals or Resignations**. No Member may withdraw or resign as a Member.

**4.4    Certificate of Units**. Units may be represented by certificates. Each certificate, if any, shall be in such form as may be determined by the Manager.

**4.5    Replacement of Lost, Stolen, or Destroyed Certificate**. Any Member claiming that his, her, or its certificate of membership is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as may be required by the Manager(s), a new certificate may be issued of the same tenor and representing the same Units as were represented by the certificate alleged to be lost, stolen, or destroyed.

**4.6    Voting Rights**. Except as expressly required by this Agreement or the Act, Members in Class A shall have no voting, approval, or consent rights. All of the Members (i.e., Members holding both Class A or Class B Units) shall have the right to approve the following matters:

7

DocuSign Envelope ID: C7897599-2D75-34FE-A5DB-C12858AWBE4G

**4.6.1**   Any agreement of merger involving the Company;

**4.6.2**   Any amendment of this Agreement in accordance with <u>Section 12.10</u>.

**4.6.3**   Amend the certificate of formation, except as provided in RCW 25.15.076(2);

**4.6.4**   Authorize a member's removal as a member of the limited liability company as provided in RCW 25.15.131(1)(e);

**4.6.5**   Waive a member's dissociation as a member of the limited liability company as provided in RCW 25.15.131(1) (f), (g), or (h);

**4.6.6**   Authorize the withdrawal of a member from the limited liability company as provided in RCW 25.15.131(2);

**4.6.7**   Compromise any member's obligation to make a contribution or return cash or other property paid or distributed to the member in violation of this chapter as provided in RCW 25.15.196(2);

**4.6.8**   Amend the certificate of formation and extend the date of dissolution, if a dissolution date is specified in the certificate of formation, as provided in RCW 25.15.265(1);

**4.6.9**   Dissolve the limited liability company as provided in RCW 25.15.265(3);

**4.6.10**  Sell, lease, exchange, or otherwise dispose of all, or substantially all, of the limited liability company's property, other than in the ordinary course of the limited liability company's activities or activities of the kind carried on by the limited liability company; or

**4.6.11**  Undertake any other act outside the ordinary course of the limited liability company's activities.

**4.7**   **Action by Members**.   Except as otherwise set forth in this Agreement or the Certificate, or as otherwise required by the Act, the vote of the Members holding a majority of the Percentage Interests of the Class or Classes entitled to vote shall be the act of the Members. Any such vote may be taken (a) at a meeting of the Members (held in person or by telephonic conference call), or (b) by written consent.

**4.8**   **No Managerial Authority**.   The Members shall have no power to participate in the Company's management except as expressly authorized by this Agreement or the Certificate and except as expressly required by the Act.  Unless expressly and duly authorized in advance in writing to do so by the Manager(s), no Member, in his, her, or its capacity as such, shall have any power or authority to bind or act on the Company's behalf in any way, to pledge its credit, or to render it liable for any purpose.

**4.9**   **Competing Activities**.   The Members, the Manager, and their respective Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the

Company's business so long as they are not in direct competition with the Company. Neither the Company nor any Member shall have any right in or to any such other ventures or activities or to the income or proceeds derived therefrom. No party shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.

**5.**     **Management and Control of the Company.**

    **5.1**     **Exclusive Management by the Managers**. The Company's business, property, and affairs shall be managed exclusively by the Managers. Except for situations in which the Members' approval is expressly required by the Certificate or this Agreement, the Managers shall have full, complete, and exclusive authority, power, and discretion to manage and control the Company's business, property, and affairs, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business, property, and affairs.

    **5.2**     **Appointment of Manager**.

        **5.2.1**     <u>Number and Term of Manager</u>. The Company shall have three or more Managers. Presently Jennifer Liao, Norman Wu, and Caleb Wang are the Managers of the Company. The Manager shall, by a majority vote, be appointed, removed, and serve at the pleasure, of the Class B Members. Any tie in voting may be resolved in accordance with the tie breaking procedures in <u>Section 12</u> of this Agreement. Unless a Manager resigns, is removed, or is otherwise unable to act, the Manager shall hold office during the term of the Company.

        **5.2.2**     <u>Resignation</u>. Any Manager may resign at any time by giving written notice to the Company. The resignation of any Manager shall take effect upon the receipt of that notice or such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

        **5.2.3**     <u>Removal</u>. A Manager may be removed at any time, but only by the majority vote of the parties entitled to appoint such Manager under this Agreement.

        **5.2.4**     <u>Vacancies</u>. In the event a vacancy is created by reason of the death, removal or resignation of a Manager, such vacancy shall be filled by the parties having authority to appoint such former Manager.

    **5.3**     **Action by Manager**. Except as otherwise specifically set forth in this Agreement, any Manager, **acting alone**, may take any action that the Manager is authorized to take under this Agreement or the Code, except those actions that are outside the ordinary day-to-day business of the Company. For activity outside the ordinary day-to-day business of the Company, Managers are required to vote in accordance with the provisions of <u>Section 12</u> of this Agreement. Some activities that are not within the ordinary day-to-day business of the company, include:

        **5.3.1**     A material change in the purposes or the nature of the Company's

business.

      **5.3.2**   The merger of the Company with any other entity or the sale of all or substantially all of the Company's assets.

      **5.3.3**   The amendment of this Agreement.

      **5.3.4**   Any contract, agreement, or venture with an aggregate value of $10,000 or more.

    **5.4**   <u>**Powers of the Manager**</u>.  Except as otherwise specifically set forth in this Agreement, a Manager shall have all necessary power to manage and carry out the Company's purposes, business, property, and affairs, including, without limitation, the power to exercise on behalf and in the name of the Company.

    **5.5**   <u>**Limitations on Power of the Manager**</u>.  The Manager shall not have authority to cause the Company to engage in any of the acts specified in <u>Section 4.6</u> without first obtaining the approval of all the Members (i.e., Members holding Class A and B Units).

    **5.6**   <u>**Performance of Duties; Liability of Manager**</u>.  A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage was the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.  The Manager shall perform managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company and its Members.  A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.  In performing his, her, or its duties, a Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless the Manager has knowledge concerning the matter in question that would cause such reliance to be unwarranted:

      **5.6.1**   One or more officers, employees, or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

      **5.6.2**   Any attorney, independent accountant, or other person as to matters that the Manager reasonably believes to be within such person's professional or expert competence; or

      **5.6.3**   A committee upon which the Manager does not serve, duly designated in accordance with a provision of the Certificate or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

    **5.7**   <u>**Devotion of Time**</u>.  No Manager is obligated to devote all of such Manager's time or business efforts to the Company's affairs.  Each Manager shall, however, devote whatever time, effort, and skill as the Manager deems appropriate for the Company's efficient operations.

    **5.8**   <u>**Transactions between the Company and a Manager**</u>.  Notwithstanding that it may constitute a conflict of interest, a Manager may, and may cause an Affiliate to, engage in

DocuSign Envelope ID: C7897589-2D7F-34FE-A5DB-C12858AABE4C

any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement.

**5.9**     **Fiduciary Duties; Reliance of Manager**.   The duty of care owed by the Members and Manager to the Company and its Members consists solely of and is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. The duty of loyalty owed by the Members and Manager to the Company and its Members consists solely of and is limited to refraining from engaging in fraud or deceit. Except as expressly set forth herein, no Member or Manager shall have any fiduciary or other duty to the Company or any Member with respect to the business and affairs of the Company. In performing his or her duties, a Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless the Manager has knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager acts in good faith and after reasonable inquiry:

**5.9.1**   One or more officers, employees, or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

**5.9.2**   Any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such person's professional or expert competence; or

**5.9.3**   A committee upon which the Manager does not serve, duly designated in accordance with a provision of the Certificate or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

**5.10**     **Payments to the Manager**.   Additionally, the Company shall reimburse the Manager for any and all costs and expenses properly incurred by the Manager in connection with the management of the Company.

**5.11**     **Officers; Appointment**.   The Manager(s), acting together, may appoint officers at any time.  The officers of the Company, as may be deemed necessary by the Manager(s), may include, without limitation, a President, a Chief Financial Officer and a Secretary.  The officers shall serve at the pleasure of the Manager(s), subject to all rights, if any, of an officer under any contract of employment.  Any individual may hold any number of offices.  No officer need be a resident of the State of Washington or citizen of the United States.  If a Manager is not an individual, such Manager's officers may serve as officers of the Company if elected by the Manager.  Subject to the powers of the Manager(s) set forth herein, (i) the President shall have general supervision of the operations of the Company and shall have such powers and duties usually vested in a President, (ii) the Chief Financial Officer shall have general supervision of the financial affairs of the Company and shall have such powers and duties usually vested in a Chief Financial Officer, and (iii) the Secretary shall have general supervision of the non-financial records of the Company and shall have such powers and duties usually vested in a Secretary. The officers shall exercise such other powers and perform such other duties as shall be determined from time to time by the Manager(s).  The initial officers of the Company are set forth on attached **Exhibit B**.  Officers term shall be two years.  The term may be extended at the

sole discretion of Manager(s). For the purposes of this Section, a unanimous vote of the Managers is required, and each manager receives one vote. Any tie in voting may be broken in accordance with the provisions of <u>Section 12</u>.

**6.**     <u>**Distributions and Allocations.**</u>

     **6.1**     <u>**Distributions**</u>. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager(s), as they deem appropriate in their sole discretion and with the unanimous consent of the Class B Members, may elect from time to time to distribute Distributable Cash to the Members. Such distributions shall be on a pro rata basis among the Members in accordance with the provision herein.

     **6.2**     <u>**Allocations of Net Loss.**</u> Company Loss shall be allocated to the Members as follows:

         **6.2.1**    To all Class A and Class B Members pro rata according to their Percentage Interests.

         **6.2.2**    Notwithstanding the previous sections, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain (as defined in Treasury Regulations). Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited with respect to the allocation of Company Losses under this <u>Section 6.2</u>). Any loss reallocated under this <u>Section 6.2</u> shall be taken into account in computing subsequent allocations profit and losses pursuant to this <u>Section 6.2</u> so that the net amount of any item so allocated and the profit and losses allocated to each Member pursuant to this <u>Section 6.2</u>, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this <u>Section 6.2</u> if no reallocation had occurred under this <u>Section 6.2</u>.

     **6.3**     <u>**Allocations of Net Profit.**</u> Company Profit shall be allocated as follows:

         **6.3.2**    To the Class A and Class B Members pro rata according to their Percentage Interests.

         **6.3.3**    Last, to all other Members pro rata according to their Percentage Interests.

     **6.4**     <u>**Allocation of Net Profit and Loss and Distributions for Transferred Units**</u>. If any Units are transferred, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned *pro rata* to each day in the particular period of such Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, her, or its respective Units at the close of such day.

     **6.5**     <u>**Form of Distribution**</u>. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in

DocuSign Envelope ID: C7097599-2075-34FE-A50B-E12858AA9E4C

any form other than money. Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

6.6 **Return of Distributions**. Except for distributions made in violation of the Act or this Agreement, no Member shall be obligated to return any distribution to the Company, or pay the amount of any distribution for the Company's account or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or paid by a Member for the Company's account or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member.

6.7 **Obligations of Members to Report Allocations**. The Members are aware of the income tax consequences of the allocations made by this <u>Section 6</u> and hereby agree to be bound by the provisions of this <u>Section 6</u> in reporting their shares of Company income and loss for income tax purposes. Income, gain, loss, and deductions with respect to contributed property must be allocated among the members to take account of any difference between the tax basis of the property and its fair market value at the time of contribution. A member will be entitled to deduct its share of an LLC's tax losses to the extent of the tax basis in its LLC interest. Any loss in excess of such tax basis may be carried over indefinitely and deducted, subject to various limitations (e.g., passive activity and at-risk rules), in any subsequent year in which the tax basis in such member's LLC interest is increased above zero.

7. **Transfer and Assignment of Units.**

7.1 **Transfer and Assignment of Units**. Except as expressly provided in this Agreement, a Member shall not Transfer any of the Member's Units, whether now owned or hereafter acquired, unless (a) the Class B members unanimously approve the proposed transferee's admission to the Company as a Member in writing, (b) the proposed transferee executes a counterpart of, and is bound by, this Agreement, (c) the proposed transferee pays any reasonable expenses in connection with their admission as a new Member, (d) the Transfer is made in compliance with the Securities Act, the Laws, and the provisions of this Agreement, and (e) the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended. Any transfer made in violation of this provision is void.

7.2 **Certain Transfers Relating to Spouses**. Notwithstanding any other provisions of this Agreement:

7.2.1 If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards Units to that Member's spouse, then, notwithstanding that such transfer would constitute an unpermitted transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Units that were so transferred, and such former spouse shall sell the Units to that Member at the price set forth in <u>Section 7.6</u>. If the Member has failed to consummate the purchase within sixty (60) days after the award, the other Members shall have the option to purchase from the former spouse the Units.

7.2.2 If, by reason of the death of a spouse of a Member, any Units are transferred to a transferee other than (a) that Member, or (b) a trust created for the benefit of that

DocuSign Envelope ID: C7897599-2075-34FE-A5DB-C12858A9BE4C

Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as Trustee or individually possesses all of the voting interest included in those Units, then the Member shall have the right to purchase the Units from the estate or other successor of his or her deceased spouse or transferee of such deceased spouse.  The estate, successor, or transferee shall sell the Units at the price set forth in Section 7.6.  If the Member has failed to initiate the purchase within sixty (60) days after the date of death, the other Members shall have the option to purchase from the estate or other successor of the deceased spouse the Units.

7.3     **Purchase of Units upon Certain Events**.  On the occurrence of any of the following events ("**Triggering Events**") with respect to a Member, the Class B Members shall first have the option to purchase all or any portion of the Units owned by such Member (the "**Selling Member**") at the price and on the terms provided in Section 7.6. If no Class B Members execute the Option, it then extends to Class A Members. The Triggering Events are:

7.3.1     the initiation of any Bankruptcy, insolvency, or similar action of a Member;

7.3.2     the winding up and dissolution of an entity Member, or merger or other reorganization of an entity Member as a result of which the entity Member does not survive as an entity; or

7.3.3     the occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

7.4     **Notice of Triggering Event**.  Each Member agrees to promptly give notice of a Triggering Event to the other Members.  Each Member also agrees to promptly give notice to the other Members (i) of any event specified in Section 7.2, and (ii) when such Member has initiated and consummated a purchase under Section 7.2.

7.5     **Exercise of Option**.  On the receipt of notice of a Triggering Event by a Member as contemplated by the first sentence of Section 7.4, or on receipt of actual notice of any Triggering Event, if earlier, the other Members shall have the right to exercise, for a period of one hundred twenty days thereafter, the option to purchase the Units at the price and on the terms and conditions set forth in Section 7.6.  Commencing sixty days (60) after receipt of a notice under Section 7.4(i) (or sixty (60) days after receipt of actual notice of an event specified in Section 7.2, if earlier) with respect to a Member's spouse, unless the other Members have received the requisite notice under Section 7.4(ii), the other Members shall have the option to purchase the Units at the price and on the terms and conditions set forth in Section 7.6.  In each case, the Members shall have the right to purchase the selling Member's Units in the proportion that the Member's Units bears to the total Units of all of the Members who choose to participate in the purchase.

7.6     **Purchase Price and Terms**.  The purchase price for Units that are the subject of an option under this Agreement shall be the fair market value of such Units as determined under this Section 7.6.  Each of the selling and purchasing parties shall use its best efforts to mutually agree on the fair market value.  If the parties are unable to so agree within thirty (30) days of the

14

DocuSign Envelope ID: C7897599-2D75-34EE-A50B-C12858A4BE4C

date on which the option is first exercisable, the purchasing Member(s) with the largest Percentage Interest shall in good faith select an independent appraiser that is, or should be, reasonably acceptable to the selling party. The appraiser shall, within thirty (30) days after its appointment, determine the fair market value of the Units in writing and submit its report to the parties. The parties shall each pay for an equal share of the fee charged by the appraiser. The option purchase price as so determined shall be payable as follows: (a) twenty percent (20%) of such purchase price shall be payable in immediately available funds at the closing, and (b) the balance of the purchase price shall be payable by the purchasing party's delivery of a promissory note to the selling party. Such promissory note shall be secured by the Units purchased, shall bear interest at the Prime Rate in effect on the date of the promissory note and shall be payable in equal monthly installments over four (4) years. Such promissory note shall be immediately due and payable in the event that the Company (i) sells substantially all of its assets, or (ii) dissolves. At the closing, the selling party shall deliver to the purchasing party such documents as may be reasonably requested by the purchasing party to evidence the transfer of the Units being purchased.

**7.7** **Binding Effect on Transferees**. Any transferee of Units shall take subject to the terms of this Agreement, including, without limitation, the restrictions on Transfer and the purchase options set forth in this Agreement.

**7.8** **Transfers in Violation of Agreement**. Upon any Transfer of any Units in violation of this Section 7, the transferee shall hold only an Economic Interest in the Company and shall have no right to vote or participate in the Company's management. In such case, the transferring Member will cease to hold the voting and information rights relating the transferred Units and will cease to be a member with respect to the transferred Units.

## 8. ACCOUNTING, RECORDS, AND REPORTING

**8.1** **Books and Records**. The Company's books and records shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The Company's books and records shall reflect all the Company's transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office all of the following:

**8.1.1** A current list of the full name and address of each Member, together with the Capital Contributions, Capital Account, Units and Percentage Interest of each Member;

**8.1.2** A copy of the Certificate and any and all amendments thereto;

**8.1.3** Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

**8.1.4** A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

**8.1.5** Copies of the Company's financial statements, if any, for the six (6) most recent Fiscal Years; and

DocuSign Envelope ID: C7897599-2075-44FE-AFDB-C12858AABE4C

**8.1.6**   The Company's books and records as they relate to the Company's internal affairs for at least the current and past four (4) Fiscal Years.

**8.2**     **Annual Filing**.  The Manager(s) shall cause to be filed with the Washington Secretary of State, and all other agencies or municipalities, all statements, renewals, and forms, required under law.

**8.3**     **Bank Accounts**.  The Manager(s) shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

## 9.      Dissolution and Winding Up.

**9.1**     **Dissolution**.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

**9.1.1**   The entry of a decree of judicial dissolution pursuant; or

**9.1.2**   The unanimous vote of the Class B Members to dissolve.

**9.2**     **Certificate of Dissolution**.  As soon as possible following the occurrence of any of the events specified in Section 9.1, the Manager shall execute a Certificate of Dissolution in such form as shall be prescribed by the Washington Secretary of State and file the Certificate of Dissolution as required by the Act.

**9.3**     **Winding Up**.  Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Manager, or, if there is then no Manager, the Members, shall be responsible for overseeing the Company's winding up and liquidation, shall take full account of the Company's liabilities and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.5.  The Persons winding up the Company's affairs shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the Company' records.  The Persons winding up the Company's affairs shall be entitled to reasonable compensation for such services.

**9.4**     **Distributions in Kind**.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Section 6, and the Members' Capital Accounts shall be adjusted to reflect such allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).  The fair market value of such asset shall be determined by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Member or a liquidating trustee and approved by the Members.

16

DocuSign Envelope ID: C7897599-2075-4AFE-A5DB-C12858A4BE46

**9.5** **Order of Distributions**. After (a) determining that all known debts and liabilities of the Company in the process of winding-up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, and (b) taking into account allocations of Net Profits and Net Losses for the Company's taxable year during which liquidation occurs, the remaining assets shall be distributed to the Members (i) first, in Class B in accordance with their positive Capital Account balances; (ii) Second, in Class A, in accordance with their positive Capital Account balances; and (ii) Third, in accordance with the provisions of Section 6.3; Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

**9.6** **Compliance with Regulations**. All distributions to the Members upon the Company's winding-up and dissolution shall be strictly in accordance with the positive Capital Account balance limitation and other laws, rules, regulations, or requirements.

**9.7** **Limitations on Payments Made in Dissolution**. Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look solely to the Company's assets for the return of his, her, or its positive Capital Account balance and shall have no recourse for his, her, or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Members or any other Member.

**9.8** **Certificate of Cancellation**. The Manager shall cause to be filed in the office of, and on a form prescribed by, the Washington Secretary of State, a Certificate of Cancellation of the Certificate upon the completion of the winding up of the Company's affairs.

**10.** **Indemnification and Insurance.**

**10.1** **Indemnification**.

**10.1.1** To the fullest extent permitted by law, the Company shall defend and indemnify any Member or Manager and may (if authorized in the specific case by the Manager) indemnify any other Person who was or is a party, or who is threatened to be made a party, to any Proceeding (as defined below) by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (each such person being referred to herein as an "agent"), against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such Proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal Proceeding, such Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful. "**Proceeding**" means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

17

DocuSign Envelope ID: C7097599-2075-44EE-A50B-C12858A0BE4C

10.1.2   Expenses of each Person indemnified but not entitled to be defended under Section 10.1.1 actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Manager, upon receipt of an undertaking by such Person to repay such amount if there is a final determination that such individual is not entitled to indemnification as provided herein.

10.1.3   The Company shall make all indemnification provided for pursuant to this Section 10 solely out of Company assets and no Member shall have any personal liability hereunder.

**10.2   Insurance**.   The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

**11.   Investment Representations.**

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

**11.1   Pre-existing Relationship or Experience.**   (i) Such Member has a pre-existing personal or business relationship with the Company or one or more of its officers, Manager or controlling persons; or (ii) by reason of such Member business or financial experience, or by reason of the business or financial experience of such Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, such Member is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting such Member's own interests in connection with this investment.

**11.2   No Advertising.**   Such Member has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

**11.3   Investment Intent.**   Such Member is acquiring the Membership Interest for investment purposes for such Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest.  No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

**11.4   Accredited Investor.**   Such Member is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Act.

**11.5    Purpose of Entity.**  If such Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

**11.6    Economic Risk.**  Such Member is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof.

**11.7    No Registration of Membership Interest.**  Such Member acknowledges that the Membership Interest has not been registered under the Securities Act, or qualified under the Laws in reliance, in part, on such Member's representations, warranties, and agreements herein.

**11.8    Membership Interest in Restricted Security.**  Such Member understands that the Membership Interest is a "restricted security" under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may not be resold without registration under the Securities Act except in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely.

**11.9    No Obligation to Register.**  Such Member represents, warrants, and agrees that the Company and the Manager are under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist such Member in complying with any exemption from registration and qualification.

**11.10    Legends.**  Such Member understands that the certificates (if any) evidencing the Membership Interest may bear one or all of the following legends:

**11.10.1**  "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS.  SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN IN THE COMPANY'S OPERATING AGREEMENT, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY."

**11.10.2**  Any legend required by applicable state securities laws.

**11.11    Investment Risk.**  Such Member acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by such Member of such Member's entire investment in the Company, that such Member understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history.

DocuSign Envelope ID: C7097599-2075-34FE-A5DB-C12858A9BE4G

**11.12**  **Investment Experience.**  Such Member is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships engaged in speculative and high-risk ventures.  This representation shall not be applicable to any Person that provides the Manager with such written information as the Manager deem necessary to substantiate that the Member engaged and designated a Professional Advisor to assist the Member in evaluating the risks and merits of an investment in the Company.

**11.13**  **Restrictions on Transferability.**  Such Member acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for such Member to liquidate such Member's investment in the Company.

**11.14**  **Information Reviewed.**  Such Member has received and reviewed such Member considers necessary or appropriate for deciding whether to purchase the Membership Interest.  Such Member has had an opportunity to ask questions and receive answers from the Company and its officers, Manager and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort or expense) which such Member deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to such Member.

**11.15**  **No Representations by Company.**  Neither any Manager, any agent or employee of the Company or of any Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to such Member that such Member may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of any Manager or its Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

**11.16**  **Legal Matters.**  Such Member has been advised to consult with such Member's own attorney regarding all legal matters concerning an investment in the Company, and has done so, to the extent such Member considers necessary.

**11.17**  **Tax Consequences.**  Such Member acknowledges that the tax consequences to such Member of investing in the Company will depend on such Member's particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to such Member of an investment in the Company.  Such Member will look solely to, and rely upon, such Member's own advisers with respect to the tax consequences of this investment.

DocuSign Envelope ID: C7897599-2D75-34FE-A50B-C12858AABE4C

**11.18    Allocation or Apportionment of Tax Losses.** Following the allocation of losses under the terms of the Agreement, all Members may allocate the economic benefit of their initially allocated share of the Company's operating losses to other Members, only in compliance with federal tax regulations and upon the unanimous consent of the Members.

**11.19    Indemnity.**    Such Member shall defend, indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity, from and against any and all losses, claims, damages, costs, expenses (including attorneys' fees and costs) and other liabilities resulting from any breach of any representation or warranty of such Member contained in this Section 11.

## 12.    Quorum and Voting.

**12.1    Quorum.** A majority of the Units entitled to vote, represented in person, over the phone, in writing, or by proxy, shall constitute a quorum for any voting by the Members.

**12.2    Voting.** Unless otherwise provided in this Agreement, only members in Class B shall be entitled to vote on any matter. Each member entitled to vote receives one vote for each Unit as set forth in Exhibit A. Any holder member entitled to vote on any matter may vote part of the units in favor of the proposal and refrain from voting the remaining units or vote them against the proposal, other than as provided herein, but, if the shareholder fails to specify the number of shares such shareholder is voting affirmatively, it will be conclusively presumed that the shareholder's approving vote is with respect to all shares such shareholder is entitled to vote.

**12.3    Voting Proxies.** At any vote of the members, a member may vote by proxy executed in writing by the shareholder or by his or her duly authorized attorney-in-fact. Such proxy must be received by the Manager(s) prior to any vote.

**12.4    Voting Tie Resolution.** In the event of a tie in the Units or votes cast in any vote by the managers or members entitled to vote, one tie-breaking vote may be cast by the following in the order of priority:

**12.4.1** A Class B Member or Manager who did not previously vote;

**12.4.2** The Class A member with the largest number of Units, if that Member did not already vote; or,

**12.4.3** An attorney, accountant, or other licensed professional previously engaged by the Company prior to the voting tie in question;

## 13.    Miscellaneous.

**13.1    Counsel to the Company**. Counsel to the Company may also be counsel to any Member or Manager, or any Affiliate of a Member or Manager. The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the Washington Rules of Professional Conduct or similar rules

in any other jurisdiction (the "**Rules**").  The parties further acknowledge that Company Counsel has represented only the Company in connection with the formation of the Company and the preparation and negotiation of this Agreement.

  **13.2** **Complete Agreement**.  This Agreement and the Certificate constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members.  No representation, statement, condition, or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.  To the extent that any provision of the Certificate conflicts with any provision of this Agreement, the Certificate shall control.

  **13.3** **Binding Effect**.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members and their respective successors and assigns.

  **13.4** **Parties in Interest**.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

  **13.5** **Headings**.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

  **13.6** **Interpretation**.  If any claim is made by any Member relating to any conflict, omission, or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, her, or its counsel.

  **13.7** **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, excluding any laws that direct the application of another jurisdiction's laws.

  **13.8** **Severability**.  If any provision of this Agreement or the application of such provision to any person or circumstance is held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

  **13.9** **Notices**.  All notices, demands, and communications of any kind under the terms of this Agreement shall be in writing and shall be deemed to have been delivered and received (a) when personally delivered, or (b) on the third (3rd) business day after which sent by registered or certified mail, postage prepaid, return receipt requested, or (c) on the date on which transmitted by facsimile or other electronic means generating a receipt evidencing a successful transmission (provided that, on the same date, a copy of such notice is sent by registered or certified mail, postage prepaid, return receipt requested), or (d) on the next business day after the

business day on which deposited with a regulated public carrier (e.g., FedEx) for overnight delivery, freight prepaid, addressed to the Person for whom intended at the address or facsimile number (if any) shown on **Exhibit A** or such other address or facsimile number (if any), notice of which is given in a manner permitted by this Section.  Any payment required or permitted to be made to any Member under any provision of this Agreement shall be deemed to have been made if delivered or mailed in the manner provided above to the address to which notices, demands, and other communications to such Member are to be delivered pursuant to the foregoing.

      **13.10**  **Amendments**.  Except as otherwise expressly provided in this Agreement, all amendments to this Agreement must be in writing and signed by all of the then-current Members.

      **13.11**  **Attorneys' Fees**.  If any dispute between the Company and the Members or among the Members results in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs, and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

      **13.12**  **Remedies Cumulative**.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

      **13.13**  **Additional Documents and Acts**.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

      **13.14**  **Consent of Spouse**.  Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have his or her spouse execute a consent substantially in the form attached to this Agreement as **Exhibit C**.

      **13.15**  **Counterparts**.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

*[signature lines follow below]*

**IN WITNESS WHEREOF,** the parties have executed this Operating Agreement of Wu Liao, LLC, a Washington limited liability company, effective as of the date first set forth above.

"**Members**"

**Class A Members:**

_____     Date: ___4/17/2018_____

OPERATING AGREEMENT OF

Wu Liao, LLC, a Washington Limited Liability Company

COUNTERPART SIGNATURE PAGE FOR MEMBERS

The undersigned hereby agrees to each and every provision of and hereby executes the Amended Operating Agreement of Wu Liao, LLC, a copy of which has been provided to the undersigned.

Date: 4/14/2018 _____

Caleb Wang
_____
Print Name

_____
Signature

Date: 4/17/2018 _____

Li Yi
_____
Print Name

_____
Signature

When executed, this Counterpart Signature Page shall be attached as part and become a part of the Amended Operating Agreement of Wu Liao, LLC, a Washington State Limited Liability Company.

THE INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE.  WITHOUT SUCH REGISTRATION, SUCH INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED, EXCEPT UPON CONSENT OF THE GENERAL PARTNERS AND DELIVERY TO THE COMPANY OF AN ACCEPTABLE OPINION OF COUNSEL THAT REGISTRATION IS NOT REQUIRED.

**EXHIBIT A**
**to the**
**Amended Operating Agreement dated June 29, 2017**
**Wu Liao, LLC, a Washington State limited liability company**

| Members' Names and Addresses | Capital Contributions | Units | Percentage Interests |
|---|---|---|---|
| **Class A** | | | |
| Li Yi | $70,000 | 560 | 5.6% |
| All Other Class A Members | $190,000 | 1,520 | 15.2% |
| **Class B** | | | |
| All Class B Members (including employee pool) | $235,000 | 7,920 | 79.2% |


**EXHIBIT B**

**OFFICERS**

The officers of the Company are set forth below.

Name of Officer

Caleb Wang

Title

President
Vice President
Secretary
CFO

26

DocuSign Envelope ID: C7897599-2075-34FE-A5DB-C12858AA9E4C

## EXHIBIT C

## CONSENT OF SPOUSE (required if signing as an individual)

I, _____, am the spouse of _____, who is a member of Wu Liao, LLC, a Washington limited liability company (the "**Company**"). My spouse has signed the Company's Amended and Restated Operating Agreement dated as of June 29, 2015 (the "**Agreement**"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement. I hereby acknowledge and agree for myself, as well as for my heirs, successors, personal representatives, trustees, receivers, and assignees, as follows:

1.　　**Understanding of Agreement**. I have carefully read the Agreement and I know and clearly understand its contents.

2.　　**Transfer Restrictions and Purchase Options**. I specifically acknowledge and agree to the provisions in the Agreement that contain restrictions on transfers of ownership interests in the Company and that grant other parties rights to purchase my spouse's interest in the Company and/or my interest in the Company, if any. I will take no action at any time to hinder the operation of the Agreement on such interest(s). I further agree that if I predecease my spouse, I will not transfer any ownership interest in the Company that I now have or that I may hereafter acquire, by will or otherwise, other than in a manner permitted by the terms and provisions of the Agreement.

3.　　**Binding Effect of Agreement**. I agree that the provisions of the Agreement shall be fully binding and conclusive on any ownership interests in the Company that I now have or that I may hereafter acquire.

4.　　**Amendment of Agreement**. I agree that my spouse may join in any future amendment or modification of the Agreement without any further signature, acknowledgment, agreement or consent on my part, and I further agree that any ownership interest in the Company that I now have or that I may hereafter acquire shall be subject to the provisions of the Agreement as so amended.

5.　　**Advice of Counsel**. I represent and acknowledge that I have been advised and encouraged to seek independent counsel of my own choosing in connection with the Agreement. I freely, voluntarily and knowingly execute this Consent.

Dated: _____, 2015　　　　　　　_____

# EXHIBIT 2

**JOINT ACTION BY UNANIMOUS WRITTEN CONSENT
OF THE MANAGERS AND MEMBERS
OF WU LIAO, LLC**

**Dated: January __, 2022**

The undersigned, constituting all of the managers (the "***Managers***") and members (the "***Members***") of Wu Liao, LLC, a Washington limited liability company (the "***Company***"), acting pursuant to the Washington limited liability company act and the Company's Amended Operating Agreement dated August 30, 2018, hereby adopt and approve the following resolutions by written consent effective as if such action had been taken at a meeting duly called and held:

***Formation of and Contribution to Opco***

**WHEREAS**, after review and consideration, the Managers and the Members have determined that it is advisable and in the best interests of the Company and the Members for the Company to create The XCJ LLC, a Delaware limited liability company, as a newly created, wholly owned subsidiary of the Company ("***Opco***"); and

**WHEREAS**, in exchange for the issuance of 100% of the membership interests in Opco, the Managers and the Members desire to contribute each of the assets set forth on Exhibit A, which assets constitute all of the assets used by the Company in its direct-to-consumer business (the "***Opco Contribution***") and, now therefore be it:

**RESOLVED**, that the creation of Opco be, and hereby is, authorized and approved;

**RESOLVED**, that the Managers and the Members hereby approve the execution and filing of a Certificate of Formation for Opco in substantially the form attached hereto as Exhibit B;

**RESOLVED**, that the Managers and the Members hereby approve the execution of an Operating Agreement in substantially the form attached hereto as Exhibit C and authorizes the same as the governing document of Opco; and

**RESOLVED**, that the Managers and the Members hereby approve the execution and performance of a Contribution Agreement in substantially the form attached hereto as Exhibit D to effect the Opco Contribution.

***Formation of and Contribution to Holdco***

**WHEREAS**, after review and consideration, the Managers and the Members have determined that it is advisable and in the best interests of the Company and its members for the Company to create XCJ FT LLC a Delaware limited liability company, as a newly created, wholly owned subsidiary of the Company ("***Holdco***"); and

1

**WHEREAS**, in exchange for the issuance of 100% of the membership interests in Holdco, the Managers and the Members desire to contribute all of the Company's interest in Opco to Holdco (the "***Holdco Contribution***") and, now therefore be it:

> **RESOLVED**, that the Managers and the Members hereby approve the creation of Holdco;

> **RESOLVED**, that the Managers and the Members hereby approve the execution and filing of a Certificate of Formation for Holdco in substantially the form attached hereto as <u>Exhibit E</u>;

> **RESOLVED**, that the Managers and the Members hereby approve the execution of an Operating Agreement in substantially the form attached hereto as <u>Exhibit F</u> and authorizes the same as the governing document of Holdco; and

> **RESOLVED**, that the Managers and the Members hereby approve the execution and performance of a Contribution Agreement in substantially the form attached hereto as <u>Exhibit G</u> to effect the Holdco Contribution.

### Distribution of XCJ FT LLC

**WHEREAS**, the Managers and the Members have determined that it is in the best interests of the Company and the Members that the Company distribute 100% of the membership interests in Holdco (the "***Interest***") to certain of the Members (the "***Distribution***") in accordance with a Distribution Agreement substantially in the form attached hereto as <u>Exhibit H</u> (the "***Distribution Agreement***") and, now therefore be it:

> **RESOLVED**, that the Distribution be, and it hereby is, authorized and approved in all respects;

> **RESOLVED**, that the form, terms and provisions of the Distribution Agreement and such other agreements, documents, or instruments as are contemplated thereby or are otherwise necessary or appropriate to carry out the Distribution (collectively, the "***Distribution Documents***"), be, and hereby are, authorized and approved, and the Managers and the officers of the Company (each, an "***Authorized Representative***") be, and each of them hereby is, authorized and directed to execute and deliver the Distribution Documents on behalf of the Company, in each case, with such changes thereto as such officer shall deem necessary or appropriate, such approval to be evidenced conclusively by the execution thereof; and

> **RESOLVED**, that the Authorized Representatives be, and each of them hereby is, authorized, empowered and directed to take all such actions and execute all such further documents, agreements and other instruments as any such Authorized Representative determines to be necessary or desirable to effect the Distribution.

*Omnibus Resolutions*

**RESOLVED**, that the authority given hereunder shall be deemed retroactive and any and all acts authorized hereunder which were performed by any member, manager, officer, agent or representative of the Company or any person acting for or on behalf of the Company, are hereby ratified, confirmed and approved as of the date such actions were taken;

**RESOLVED**, that the Authorized Representatives be, and each of them hereby is, authorized and empowered to take all such further action and to execute and deliver all such further agreements, certificates, instruments and documents, in the name and on behalf of the Company; to pay or cause to be paid all expenses; to take all such other actions as any such Authorized Representative shall deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions; and

**RESOLVED**, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirements of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Representatives to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

17950367_v2

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned have executed this joint action by unanimous written consent to be effective as of the date set forth above, notwithstanding the actual date of execution.  Any copy, facsimile or other reliable reproduction of this joint action by unanimous written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used.  This joint action by unanimous written consent shall be filed with the minutes of the proceedings of the Company.

**MANAGERS**:

_____
Jennifer Liao


_____
Norman Wu


_____
Caleb Wang

**CLASS B MEMBER:**

_____
Name:

**CLASS A MEMBER:**

_____

Name: David Yi

**EXHIBIT A**

DIRECT-TO-CONSUMER BUSINESS ASSETS

1. Recipes and cooking techniques used to prepare chicken, pork and pork and shrimps dumplings and Ginger & Scallion Umami, Classic Black Vinegar, and Spicy Chili Crisp sauces
2. U.S. trademark Registration No. 5,962,272, "THE XCJ – XIAO CHI JIE"
3. thexcj.com domain name
4. The following equipment
   a. Commercial Electric Knife Sharpener
   b. Black Cart
   c. Speed Racks
   d. Platform Cart
   e. Sheet Pans
   f. Choice 1/6 Size (7x6x6) Hotel Pan
   g. Choice 1/6 Size (7x6x6) Hotel Pan Lid
   h. Choice 1/3 Size (12 3/4x7x4) Hotel Pan
   i. Choice 1/3 Size (12 3/4x7x4) Hotel Pan Lid
   j. Choice 1/2 Size (12 3/4x10 1/2x6) Hotel Pan
   k. Choice 1/2 Size (12 3/4x10 1/2) Hotel Pan Lid
   l. Choice Full Size (20 3/4x12 3/4x8) Hotel Pan
   m. Choice Full Size (20 3/4x12 3/4) Hotel Pan Lid
   n. Handheld Galaxy blender stick
   o. Digital Utility Scale
   p. Smoker's Receptacle
   q. Foot-operated Impulse Sealer
   r. SS Worktable w/ Bottom Shelf 48x24
   s. SS Utility Stand
   t. Anko HLT Forming
   u. Anko Aligning Machine
   v. Choice Full Size (20 3/4x12 3/4x6) Hotel Pan
   w. Choice 1/6 Size (7x4 1/4x4) Hotel Pan
   x. Choice 1/6 Size (7x4x4) Hotel Pan Lid
   y. Sirman Meat Mixer
   z. Aveantco Meat Grinder
   aa. Avamix Mixer
5. Lease Agreement by and between Wu Liao LLC and 2141 West Valley Hwy N, LLC, dated as of December 17, 2020, as amended.
6. Equipment Finance Agreement by and between Wu Liao, LLC and Marlin Business Bank, dated as of November 29, 2021, as amended.
7. Equipment Finance Agreement by and between Wu Liao, LLC and Marlin Business Bank, dated as of October 29, 2021, as amended.
8. The Shopify account currently being used in the Business.
9. Style Guide.

**EXHIBIT B**

CERTIFICATE OF FORMATION (OPCO)

(*See Attached*)

**STATE *of* DELAWARE**
**LIMITED LIABILITY COMPANY**
**CERTIFICATE OF FORMATION**
**OF**
**THE XCJ LLC**

This Certificate of Formation of The XCJ LLC has been duly executed and is being filed by the undersigned, an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

1.      The name of the limited liability company is The XCJ LLC.

2.      The address of its registered office in the State of Delaware is 651 N. Broad Street, Suite 206, in the City of Middletown, County of New Castle, Zip Code 19709. The name of its registered agent at such address is Legalinc Corporate Services Inc.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of this ___ day of January, 2022.


By: _____
Caleb Wang, Authorized Person

**EXHIBIT C**

OPERATING AGREEMENT (OPCO)

(*See Attached*)

# OPERATING AGREEMENT

## OF

# THE XCJ LLC,

### A DELAWARE LIMITED LIABILITY COMPANY

#### EFFECTIVE AS OF JANUARY __,2022

This Operating Agreement of The XCJ LLC, a Delaware limited liability company (the "Company"), is made effective as of January __, 2022, by the Company's sole Member, Wu Liao, LLC, a Washington limited liability company (the "Initial Member").

# ARTICLE I
# DEFINITIONS

For purposes of this Operating Agreement, in addition to capitalized terms defined elsewhere in this Operating Agreement, the following terms shall have the following meanings:

Act.  The Delaware Limited Liability Company Act, as amended from time to time.

Additional Member.  A Member other than the Initial Member who has acquired a Membership Interest from the Company.

Admission or Admit.  The act by which the transferee of a Membership Interest or an Additional Member becomes a Member of the Company.

Capital Contribution.  The cash, cash equivalents or the agreed fair market value of Property which a Member contributes to the Company, net of any liabilities secured by such contributed property which the Company is considered to have assumed or taken subject to.

Certificate.  The Certificate of Formation as filed with the Secretary of State pursuant to the Act and as may be amended from time to time.

Distribution.  A transfer of Property to a Member on account of the Member holding a Membership Interest.

Disposition or Dispose.  Any Transfer or any mortgage, pledge, grant, hypothecation or other transfer as security or encumbrance.

Operating Agreement.  This Operating Agreement of the Company, as amended from time to time.

Manager.  The Person designated as such in accordance with this Operating Agreement together with any successors appointed in accordance with the terms of this Operating Agreement.

Member.  The Initial Member and each of the parties who may hereafter become Members.

Membership Interest.  A Member's entire interest in the Company including such Member's economic interest, management rights and such other rights and privileges that the Member may enjoy by being a Member.

Person.  Any individual or any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any

foreign trust or foreign business organization, and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person" where the context so permits.

Property.  Any property, real or personal, tangible or intangible (including goodwill and rights to income), including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

Secretary of State.  The Secretary of State of Delaware.

Transfer.  Any sale, assignment, gift, conveyance, exchange or transfer (including dispositions by operation of law), but not including any mortgage, pledge, grant, hypothecation or other transfer as security or encumbrance, except with respect to an absolute transfer in payment or by way of foreclosure of the obligation secured by such mortgage, pledge, grant, hypothecation or other security or encumbrance.

Taxing Jurisdiction.  Any Federal, state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

**ARTICLE II**
**FORMATION**

Section 2.1    Organization.  On January __, 2022, Caleb Wang, as authorized person, organized the Company as a Delaware limited liability company by executing and delivering the Certificate to the Secretary of State in accordance with and pursuant to the Act.  The Company and the Member hereby forever discharge the organizer, and the organizer shall be indemnified by the Company and the Member from and against any expense or liability actually incurred by the organizer by reason of having been the organizer of the Company.

Section 2.2    Operating Agreement, Effect of Inconsistencies with Act.  It is the express intention of the Member that this Operating Agreement shall be the sole governing document for the Company and, except to the extent a provision of this Operating Agreement is expressly prohibited or ineffective under a nonwaivable provision of the Act or other applicable law, this Operating Agreement shall govern even when inconsistent with, or different than, the provisions of the Act or any other applicable law.  To the extent any provision of this Operating Agreement is prohibited or ineffective under a nonwaivable provision of the Act or other applicable law, this Operating Agreement shall be considered amended to the least degree possible in order to make this Operating Agreement effective under the Act or other applicable law.  If either of the Act or other applicable law is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.  The Member shall be entitled to rely on the provisions of this Operating Agreement, and the Member shall not be liable to the Company for any action or refusal to act taken in good faith reliance on the terms of this Operating Agreement.

Section 2.3    Name.  The name of the Company is The XCJ LLC, and all business of the Company shall be conducted under that name or under any other name, but in any case, only to the extent permitted by applicable law.

Section 2.4    Existence.  The Company shall have perpetual existence and shall continue until dissolved in accordance with this Operating Agreement.

Section 2.5    Registered Agent and Registered Office Address.  The Company's initial registered office address and the name of the registered agent at such address shall be as set forth in the Certificate.  The registered office address and registered agent may be changed from time to time by the Manager by making an appropriate filing regarding such change in the address of the new registered office address or the name of the new registered agent with the Secretary of State pursuant to the Act.

Section 2.6    Principal Office.  The principal office of the Company shall be 2141 West Valley Highway North, Bldg B, Auburn, WA 98001.  The principal office may be changed from time to time by making an appropriate filing regarding such change of the address of the principal office with the Secretary of State pursuant to the Act.  The Company may locate its places of business at any other place or places as the Manager may from time to time deem advisable.

## ARTICLE III
## NATURE OF BUSINESS

The Company may carry on any lawful business, purpose or activity except as provided in the Act.  The Company shall have the authority to do all things necessary or convenient to accomplish such business, purpose or activity.

## ARTICLE IV
## ACCOUNTING AND RECORDS

Section 4.1    Records to be Maintained.  The Manager shall maintain the records required by the Act to be maintained at the principal office of the Company.

Section 4.2    Method of Accounting.  The Manager shall determine from time to time the method of accounting under which the records of the Company shall be kept.

## ARTICLE V
## NAME AND ADDRESS OF THE MEMBER

The name and address of the Member is:    Wu Liao, LLC
                                          278 106th Ave NE
                                          Bellevue, WA 98004

## ARTICLE VI
## RIGHTS AND DUTIES OF THE MEMBER

Section 6.1    Consent of the Member.  At any time that the Company has only one Member, the affirmative consent (regardless of whether written, oral or by course of conduct) of the Member shall constitute "written consent of all members" for purposes of the Act, except to the extent that a nonwaivable provision of the Act requires that such consent be in writing, in

4

which case the written consent of the Member shall constitute the "written consent of all members".

Section 6.2    Liability of Member.  The Member shall not be liable as such for the liabilities of the Company.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Operating Agreement or the Act shall not be grounds for imposing personal liability on the Member for liabilities of the Company.

## ARTICLE VII
## CONFLICTS OF INTEREST

Section 7.1    Business Opportunities.  A Member or Manager shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company.  It is expressly understood that the Member or Manager may enter into transactions that are similar to the transactions into which the Company may enter.

Section 7.2    No Duty.  A Member or Manager does not violate a duty or obligation owed to the Company merely because the Member's or Manager's conduct furthers the Member's or Manager's own interest.  A Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for and transact other business with the Company, and has the same rights and obligations with respect to any such matter as those of a Person who is not a Member or Manager, subject to applicable law.  No transaction with the Company shall be voidable solely because a Member or Manager has a direct or indirect interest in the transaction if the transaction is fair to the Company.

## ARTICLE VIII
## OFFICERS

Section 8.1    Officers.  The Manager may appoint one or more officers or agents of the Company with such titles and authorities as determined by the Manager.  Each such Person shall hold such position until he, she, or it resigns, dies or is removed by the Manager.  The Manager may remove an officer or agent at any time with or without cause.  An officer or agent may resign at any time by giving written notice to the Manager.  The resignation of such officer or agent shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The Company shall reimburse the officers and agents for their reasonable expenses (as determined by the Manager in its sole discretion) incurred in connection with the Company's business.  The officers and agents shall be compensated for their services for such amount and upon such terms and conditions as determined by the Manager from time to time.

## ARTICLE IX
## MANAGEMENT AND AUTHORITY

Section 9.1    Management.  The business and affairs of the Company shall be managed by its Manager.  Except for situations in which the approval of the Member is expressly required

by this Operating Agreement or by non-waivable provisions of applicable law, the Manager shall have full and complete authority, power, and discretion to manage and control the business, affairs and Company Properties, to make all decisions regarding those matters and to perform any and all other acts and activities customary or incident to the management of the Company's business.

Section 9.2     Number, Tenure and Qualifications.  There shall be one Manager, and the Member hereby appoints Caleb Wang as Manager.  The number of managers may be increased or decreased at any time by the Member.  The Manager shall hold office until the Manager's death, resignation, or removal.  The Manager may, but need not be a Member and need not be a resident of Delaware.

Section 9.3     Resignation.   The Manager may resign at any time by giving written notice to the Member.  The resignation of the Manager shall take effect on the effective date of the written notice or at any later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.   The resignation of the Manager shall not affect the Manager's other rights as a Member and shall not constitute a resignation or withdrawal as a Member.

Section 9.4     Vacancies.  Any vacancy in the office of Manager shall be filled by the Member.

Section 9.5     Limitation of Liability and Indemnification of Manager.

(a)     The Manager will not be liable for the return of any contribution of capital of any Member or for any profits thereon, and any return of capital and profits will be made, if at all, solely from the assets and business of the Company.

(b)     Except as otherwise provided herein, the Manager will not be liable to the Company or the Member for any act or omission in connection with the business or affairs of the Company so long as the Manager acted pursuant to the duties of loyalty and care on behalf of the Company and in a manner reasonably believed by the Manager to be within the scope of authority under this Agreement and in the best interests of the Company, unless such act or omission constitutes gross negligence, reckless conduct, intentional misconduct, fraud or a knowing violation of law.

Section 9.6     Manager Has No Exclusive Duty to Company.  The Manager shall have no exclusive duty to act on behalf of the Company.  The Manager may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in any other investments or activities of the Manager.  The Manager shall not incur any liability to the Company or to the Member as a result of engaging in any other business or venture.

Section 9.7     Right to Rely on the Manager.  Any person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(a)     The identity of any Member;

(b)     The existence or nonexistence of any fact or facts which are germane to the affairs of the Company;

(c)     The persons who are authorized to execute and deliver any instrument or document of the Company; or

(d)     Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

Section 9.8     <u>Removal</u>.   The Manager may be removed at any time with or without cause by the Member.

Section 9.9     <u>Manner of Acting</u>.   The Manager need not act in writing and the affirmative consent (regardless of whether written, oral or by course of conduct) of the Manager shall constitute consent and approval of any action by the Manager for purposes of the Act, except to the extent that a nonwaivable provision of the Act requires that such consent be in writing, in which case the written consent of the Manager shall constitute the consent.

## ARTICLE X
## CONTRIBUTIONS

Section 10.1   <u>Capital Contributions</u>.   The Member may, but shall not be obligated to, make Capital Contributions to the Company.

## ARTICLE XI
## DISTRIBUTIONS

Except to the extent prohibited by the Act or other applicable law, the Manager may make Distributions as determined from time to time.

## ARTICLE XII
## TAXES

Section 12.1   <u>Disregarded Entity</u>.   Under Treasury Regulations promulgated under Section 7701 of the Internal Revenue Code of 1986, as amended, the Company shall be disregarded as an entity separate from the Member for applicable U.S. federal and state tax purposes, such that (among other things) the Company's income, gain, loss and deduction shall be taxable to the Member.

Section 12.2   <u>Elections</u>.   The Manager may make any tax elections for the Company allowed under the Internal Revenue Code of 1986, as amended, or the tax laws of any Taxing Jurisdiction.

Section 12.3   <u>Taxes of Taxing Jurisdictions</u>.   To the extent that the laws of any Taxing Jurisdiction require, the Member shall submit an agreement indicating that the Member shall make timely income tax payments to the Taxing Jurisdiction and that the Member shall accept personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Company's income and interest and penalties assessed on such income by such

Taxing Jurisdiction. If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, interest and penalty determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to such income shall be treated as a Distribution for purposes of Article XI.

## ARTICLE XIII
## DISPOSITION OF MEMBERSHIP INTEREST
## AND ADMISSION OF ADDITIONAL MEMBERS

Section 13.1   Disposition.   The Member's Membership Interest is transferable either voluntarily or by operation of law, and the Member may Dispose of all or a portion of the Member's Membership Interest. In the event of the Transfer of less than all of the Member's Membership Interest, the transferee shall be Admitted on such terms and conditions upon which the Member and the transferee may agree. In the event of the Transfer of the Member's entire Membership Interest, the transferee shall succeed to all the Member's rights under this Operating Agreement and shall be Admitted upon the effectiveness of such Transfer.

Section 13.2   Admission of Additional Members.   The Company may, to the extent and on the terms and conditions determined by the Member, Admit Additional Members and determine the Capital Contributions, rights and duties of such Additional Member.

## ARTICLE XIV
## DISSOLUTION AND WINDING UP

Section 14.1   Dissolution.   The Company shall be dissolved and its affairs wound up at the time determined by the Manager or upon such events as the Act may mandatorily require such. The death, bankruptcy, dissolution or incompetence of the Member shall not result in the dissolution of the Company.

Section 14.2   Distribution of Assets on Dissolution.   Upon the winding up of the Company, the Company's Property shall be distributed:

a.   First, to creditors, including the Member if it is a creditor (to the extent permitted by applicable law), in satisfaction of the Company's liabilities (whether by payment or the making of reasonable provision for payment thereof); and

b.   Second, to the Member in cash or Property, or partly in both, as determined by the Member.

Section 14.3   Winding Up and Certificate of Cancellation.   The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and a Distribution has been made of all of the remaining Property and assets of the Company. Upon the dissolution and the completion of the winding up process, the Member shall file such documents, instruments, certificates or articles as may be required by the Act.

**ARTICLE XV**
**AMENDMENT**

This Operating Agreement may be amended or modified from time to time only by a written instrument adopted and executed by the Member.

**ARTICLE XVI**
**INDEMNIFICATION**

Section 16.1    Indemnification of Member, Manager, Employee or Agent:  Proceeding Other Than By Company.  The Company will indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, whether civil, criminal, administrative or investigative, except an action by or in the right of the Company, by reason of the fact that he, she or it is or was a Member, Manager, employee or agent of this Company, or is or was serving at the request of the Company as manager, director, officer, employee or agent of another limited liability company or corporation, against expenses, including attorneys' fees, judgment, fines and amounts paid in settlement actually and reasonably incurred by him, her or it in connection with the action, suit or proceeding if he, she or it acted pursuant to the duties of loyalty and care and in a manner which he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to a criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, does not, of itself, create a presumption that the Person did not act in good faith and in a manner which he, she or it reasonably believed to be in or not opposed to the best interest of the Company, and that, with respect to any criminal action or proceeding, he, she or it had reasonable cause to believe that its conduct was unlawful.

Section 16.2    Indemnification of Member, Manager, Employee or Agent:  Proceeding by Company.  The Company will indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that he, she or it is or was a Member, Manager, employee or agent of this Company, or is or was serving at the request of the Company as a Member, Manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise against expenses, including amounts paid in settlement and attorneys' fees actually and reasonably incurred by him, her or it in connection with the defense or settlement of the actions or suit if he, she or it acted pursuant to the duties of loyalty and care and in a manner which he, she or it reasonably believed to be in or not opposed to the best interests of the Company.  Indemnification may not be made for any claim, issue or matter as to which such a Person has been adjudged by a court of competent jurisdiction, after exhaustion of all appeals therefrom, to be liable to the Company or for amounts paid in settlement to the Company, unless and only to the extent that the court in which the action or suit was brought or other court of competent jurisdiction determines upon application that in view of all the circumstances of the case, the Person is fairly and reasonably entitled to indemnity for such expenses as the court deems proper.

Section 16.3    Indemnity if Successful.  To the extent that a Member, Manager, employee or agent of the Company has been successful on the merits or otherwise in defense of

9

any action, suit or proceeding described in Sections 16.1 or 16.2, or in defense of any claim, issue or matter therein, the Company will indemnify the Member, Manager employee or agent against expenses, including attorneys' fees, actually and reasonably incurred in connection with the defense.

Section 16.4    Expenses.  Any indemnification under Sections 16.1 and 16.2, unless ordered by a court or advanced by the Company, must be made by this Company only as authorized in the specific case upon a determination that indemnification of the Member, Manager, employee or agent is proper in the circumstances.   The determination must be made:

     a.   by the Manager if not party to the act, suit or proceeding; or

     b.   if the Manager was a party to the act, suit or proceeding, the Member.

# ARTICLE XVII
## MISCELLANEOUS PROVISIONS

Section 17.1    Entire Agreement.   This Operating Agreement represents the entire Operating Agreement governing the relationship between the Member and the Company.

Section 17.2    Rights of Creditors and Third Parties under Operating Agreement.  This Operating Agreement is adopted by the Member for the exclusive benefit of the Company, the Member and their successors and assigns.  Except as expressly set forth herein, this Operating Agreement is not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable law, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and the Member with respect to any Capital Contribution or otherwise.

Section 17.3    Construction.    The word "including" means "including without limitation".

17950396_v3

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of The XCJ LLC, effective as of the date first set forth above.

**MEMBER:**

WU LIAO, LLC

By: _____
Name: Caleb Wang
Title:  Chief Executive Officer

**EXHIBIT D**

CONTRIBUTION AGREEMENT (OPCO)

(*See Attached*)

# CONTRIBUTION AGREEMENT

This CONTRIBUTION AGREEMENT (this "*Agreement*") is effective as of January __, 2022 (the "*Effective Date*") by and between Wu Liao, LLC, a Washington limited liability company (the "*Parent*"), and The XCJ LLC, a Delaware limited liability company (the "*Subsidiary*").

**WHEREAS**, the Subsidiary is a newly formed Delaware limited liability company, and Parent operates a direct-to-consumer business that manufactures, packages, ships and sells authentic Asian street food (the "*Business*");

**WHEREAS**, the Parent desires to contribute, convey, transfer and assign, as a capital contribution, all of Parent's right, title and interest in the Contributed Assets (defined below), and the Subsidiary desires to acquire and purchase the Contributed Assets from the Parent, on the terms and conditions set forth in this Agreement; and

**WHEREAS**, on the Effective Date, the Subsidiary shall succeed to all of the Parent's liabilities and obligations with respect to the Contributed Assets (collectively, the "*Obligations*"), as well as to all rights, privileges, preferences and goodwill related to the Contributed Assets;

**WHEREAS**, the Parent and the Subsidiary desire and intend that the contribution of the Contributed Assets to the Subsidiary be disregarded for U.S. federal income tax purposes.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      The Parent hereby irrevocably transfers, assigns, conveys and contributes to the Subsidiary, exclusively throughout the world, all of the Parent's rights, titles and interests in the Contributed Assets, free and clear of all liens, encumbrances, claims, charges, options, security interests, pledges, rights of first refusal, or other restrictions of any kind whatsoever, effective as of the Effective Date, and the Subsidiary hereby accepts such Contributed Assets and assumes and covenants to perform the Obligations. The "*Contributed Assets*" shall include all assets, rights, titles and interests exclusively relating to or currently held for the primary benefit of, material to, or necessary for the operation of the Business as it is currently conducted and currently proposed to be conducted, including without limitation:

a.   the assets referred to in <u>Exhibit A</u>;

b.   all intellectual property rights, including all copyrights, patent rights, trade secret rights, trademark rights, domain name rights, *sui generis* database rights, moral rights and all other equivalent or similar intellectual property and proprietary rights, in any jurisdiction around the world, and all business, contract rights and goodwill in, incorporated or embodied in any of the foregoing Contributed Assets, including all common law rights, registrations and applications, and all other corresponding rights, and all renewals, modifications and extensions thereof (collectively "*Intellectual Property Rights*");

c.  the domain name as listed in <u>Exhibit A</u>, as well as (i) all rights in, arising out of, or associated with such domain names, including all registrations and all rights to listings or keyword associations in any search engine or directories, and (ii) the website for the Business connected to such assigned domain name, including software, source code, text, graphics, templates, and any other content and information therein;

d.  copies of all employment agreements, proprietary information and invention agreements or consulting agreements for the Parent employees or consultants, as applicable, who contributed to or performed services for any aspect of the Business as well as all right, title and interest in any Intellectual Property Rights developed pursuant to those agreements and which are otherwise Assets; but for the avoidance of doubt, the Contributed Assets will not include assignment of such agreements, regardless of whether such employees or consultants have contributed to or performed services for any aspect of the Business;

e.  any and all equipment, facility leases and underlying agreements as listed in <u>Exhibit A</u>; and

f.  all rights to recover past, present and future damages for the breach, infringement or misappropriation, as the case may be, of any of the Contributed Assets, as well as the right to grant releases for past infringement and misappropriation.

2.  The Parent hereby represents and warrants to the Subsidiary that, as of the date hereof, the Parent is the sole owner of all rights, title and interest in and to the Contributed Assets, free and clear of all liens, encumbrances, claims, charges options, security interests, pledges, rights of first refusal, or other restrictions of any kind whatsoever, or otherwise has the full right to provide the Subsidiary with the assignment, rights, and licenses provided herein, including with respect to the Contributed Assets.

3.  The Parent hereby represents and warrants that it has all corporate power to enter into this Agreement and all other agreements and documents contemplated hereby (collectively, the "*Transaction Documents*") and to perform the transactions described in the Transaction Documents.

4.  The execution, delivery and performance of the Transaction Documents have been duly authorized by all necessary corporate or other action of the Parent.

5.  This Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto.

6.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under the present or future laws in effect during the existence of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from Agreement.  Furthermore, in

2

lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

       7.     The parties hereto shall execute all other certificates, instruments and documents and take all actions as may be reasonably required to effectuate this Agreement.

       8.     This Agreement shall be governed in all respects by the internal laws of the State of Delaware, without regard to the conflict of law principles that would apply the laws of another jurisdiction.

       9.     This Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto.

       10.     This Agreement may be executed in any number of counterparts, each of which, when executed, is deemed to be an original and all of which together are deemed to be one and the same Agreement.  A signature to this Agreement transmitted by facsimile, .pdf or other electronic means is deemed an original and binding upon the party against whom enforcement is sought.

       11.     This Agreement contains the entire agreement between the parties with respect to the matters contemplated herein, and supersedes all other prior written or oral negotiations, commitments or understandings with respect to the matters provided for herein.  No amendment or variation of the terms of this Agreement will be valid unless made in writing and executed by the parties hereto.

17951601_4

*(Signature Pages Follow)*

IN WITNESS WHEREOF, each of the undersigned parties has caused this Agreement to be duly executed as of the date first above written.

**WU LIAO, LLC**

By: _____
Name:   Caleb Wang
Title:    Chief Executive Officer

**THE XCJ LLC**

By: _____
Name:   Caleb Wang
Title:    Manager

**Exhibit A**
**Contributed Assets**

1. Recipes and cooking techniques used to prepare chicken, pork and pork and shrimps dumplings and Ginger & Scallion Umami, Classic Black Vinegar, and Spicy Chili Crisp sauces
2. U.S. trademark Registration No. 5,962,272, "THE XCJ – XIAO CHI JIE"
3. thexcj.com domain name
4. The following equipment
   a. Commercial Electric Knife Sharpener
   b. Black Cart
   c. Speed Racks
   d. Platform Cart
   e. Sheet Pans
   f. Choice 1/6 Size (7x6x6) Hotel Pan
   g. Choice 1/6 Size (7x6x6) Hotel Pan Lid
   h. Choice 1/3 Size (12 3/4x7x4) Hotel Pan
   i. Choice 1/3 Size (12 3/4x7x4) Hotel Pan Lid
   j. Choice 1/2 Size (12 3/4x10 1/2x6) Hotel Pan
   k. Choice 1/2 Size (12 3/4x10 1/2) Hotel Pan Lid
   l. Choice Full Size (20 3/4x12 3/4x8) Hotel Pan
   m. Choice Full Size (20 3/4x12 3/4) Hotel Pan Lid
   n. Handheld Galaxy blender stick
   o. Digital Utility Scale
   p. Smoker's Receptacle
   q. Foot-operated Impulse Sealer
   r. SS Worktable w/ Bottom Shelf 48x24
   s. SS Utility Stand
   t. Anko HLT Forming
   u. Anko Aligning Machine
   v. Choice Full Size (20 3/4x12 3/4x6) Hotel Pan
   w. Choice 1/6 Size (7x4 1/4x4) Hotel Pan
   x. Choice 1/6 Size (7x4x4) Hotel Pan Lid
   y. Sirman Meat Mixer
   z. Aveantco Meat Grinder
   aa. Avamix Mixer
5. Lease Agreement by and between Wu Liao LLC and 2141 West Valley Hwy N, LLC, dated as of December 17, 2020, as amended.
6. Equipment Finance Agreement by and between Wu Liao, LLC and Marlin Business Bank, dated as of November 29, 2021, as amended.
7. Equipment Finance Agreement by and between Wu Liao, LLC and Marlin Business Bank, dated as of October 29, 2021, as amended.
8. The Shopify account currently being used in the Business.
9. Style Guide.

**EXHIBIT E**

CERTIFICATE OF FORMATION (HOLDCO)

(*See Attached*)

**STATE *of* DELAWARE**
**LIMITED LIABILITY COMPANY**
**CERTIFICATE OF FORMATION**
**OF**
**XCJ FT LLC**

This Certificate of Formation of XCJ FT LLC has been duly executed and is being filed by the undersigned, an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

1.     The name of the limited liability company is XCJ FT LLC.

2.     The address of its registered office in the State of Delaware is 651 N. Broad Street, Suite 206, in the City of Middletown, County of New Castle, Zip Code 19709.  The name of its registered agent at such address is Legalinc Corporate Services Inc.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of this ___ day of January, 2022.


By:  _____

Caleb Wang, Authorized Person

**EXHIBIT F**

OPERATING AGREEMENT (HOLDCO)

(*See Attached*)

# OPERATING AGREEMENT

## OF

# XCJ FT LLC,

### A DELAWARE LIMITED LIABILITY COMPANY

#### EFFECTIVE AS OF JANUARY __,2022

This Operating Agreement of XCJ FT LLC, a Delaware limited liability company (the "Company"), is made effective as of January __, 2022, by the Company's sole Member, Wu Liao, LLC, a Washington limited liability company (the "Initial Member").

**ARTICLE I**
**DEFINITIONS**

For purposes of this Operating Agreement, in addition to capitalized terms defined elsewhere in this Operating Agreement, the following terms shall have the following meanings:

Act.  The Delaware Limited Liability Company Act, as amended from time to time.

Additional Member.  A Member other than the Initial Member who has acquired a Membership Interest from the Company.

Admission or Admit.  The act by which the transferee of a Membership Interest or an Additional Member becomes a Member of the Company.

Capital Contribution.  The cash, cash equivalents or the agreed fair market value of Property which a Member contributes to the Company, net of any liabilities secured by such contributed property which the Company is considered to have assumed or taken subject to.

Certificate.  The Certificate of Formation as filed with the Secretary of State pursuant to the Act and as may be amended from time to time.

Distribution.  A transfer of Property to a Member on account of the Member holding a Membership Interest.

Disposition or Dispose.  Any Transfer or any mortgage, pledge, grant, hypothecation or other transfer as security or encumbrance.

Operating Agreement.  This Operating Agreement of the Company, as amended from time to time.

Manager.  The Person designated as such in accordance with this Operating Agreement together with any successors appointed in accordance with the terms of this Operating Agreement.

Member.  The Initial Member and each of the parties who may hereafter become Members.

Membership Interest.  A Member's entire interest in the Company including such Member's economic interest, management rights and such other rights and privileges that the Member may enjoy by being a Member.

Person.  Any individual or any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any

2

foreign trust or foreign business organization, and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person" where the context so permits.

Property.  Any property, real or personal, tangible or intangible (including goodwill and rights to income), including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

Secretary of State.  The Secretary of State of Delaware.

Transfer.  Any sale, assignment, gift, conveyance, exchange or transfer (including dispositions by operation of law), but not including any mortgage, pledge, grant, hypothecation or other transfer as security or encumbrance, except with respect to an absolute transfer in payment or by way of foreclosure of the obligation secured by such mortgage, pledge, grant, hypothecation or other security or encumbrance.

Taxing Jurisdiction.  Any Federal, state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

## ARTICLE II
## FORMATION

Section 2.1    Organization.  On January __, 2022, Caleb Wang, as authorized person, organized the Company as a Delaware limited liability company by executing and delivering the Certificate to the Secretary of State in accordance with and pursuant to the Act.  The Company and the Member hereby forever discharge the organizer, and the organizer shall be indemnified by the Company and the Member from and against any expense or liability actually incurred by the organizer by reason of having been the organizer of the Company.

Section 2.2    Operating Agreement, Effect of Inconsistencies with Act.  It is the express intention of the Member that this Operating Agreement shall be the sole governing document for the Company and, except to the extent a provision of this Operating Agreement is expressly prohibited or ineffective under a nonwaivable provision of the Act or other applicable law, this Operating Agreement shall govern even when inconsistent with, or different than, the provisions of the Act or any other applicable law.  To the extent any provision of this Operating Agreement is prohibited or ineffective under a nonwaivable provision of the Act or other applicable law, this Operating Agreement shall be considered amended to the least degree possible in order to make this Operating Agreement effective under the Act or other applicable law.  If either of the Act or other applicable law is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.  The Member shall be entitled to rely on the provisions of this Operating Agreement, and the Member shall not be liable to the Company for any action or refusal to act taken in good faith reliance on the terms of this Operating Agreement.

Section 2.3    Name.  The name of the Company is XCJ FT LLC, and all business of the Company shall be conducted under that name or under any other name, but in any case, only to the extent permitted by applicable law.

Section 2.4    Existence.  The Company shall have perpetual existence and shall continue until dissolved in accordance with this Operating Agreement.

Section 2.5    Registered Agent and Registered Office Address.  The Company's initial registered office address and the name of the registered agent at such address shall be as set forth in the Certificate.  The registered office address and registered agent may be changed from time to time by the Manager by making an appropriate filing regarding such change in the address of the new registered office address or the name of the new registered agent with the Secretary of State pursuant to the Act.

Section 2.6    Principal Office.  The principal office of the Company shall be 2141 West Valley Highway North, Bldg B, Auburn, WA 98001.  The principal office may be changed from time to time by making an appropriate filing regarding such change of the address of the principal office with the Secretary of State pursuant to the Act.  The Company may locate its places of business at any other place or places as the Manager may from time to time deem advisable.

## ARTICLE III
## NATURE OF BUSINESS

The Company may carry on any lawful business, purpose or activity except as provided in the Act.  The Company shall have the authority to do all things necessary or convenient to accomplish such business, purpose or activity.

## ARTICLE IV
## ACCOUNTING AND RECORDS

Section 4.1    Records to be Maintained.  The Manager shall maintain the records required by the Act to be maintained at the principal office of the Company.

Section 4.2    Method of Accounting.  The Manager shall determine from time to time the method of accounting under which the records of the Company shall be kept.

## ARTICLE V
## NAME AND ADDRESS OF THE MEMBER

The name and address of the Member is:          Wu Liao, LLC
                                                278 106th Ave NE
                                                Bellevue, WA 98004

## ARTICLE VI
## RIGHTS AND DUTIES OF THE MEMBER

Section 6.1    Consent of the Member.  At any time that the Company has only one Member, the affirmative consent (regardless of whether written, oral or by course of conduct) of the Member shall constitute "written consent of all members" for purposes of the Act, except to the extent that a nonwaivable provision of the Act requires that such consent be in writing, in

which case the written consent of the Member shall constitute the "written consent of all members".

Section 6.2     Liability of Member.  The Member shall not be liable as such for the liabilities of the Company.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Operating Agreement or the Act shall not be grounds for imposing personal liability on the Member for liabilities of the Company.

## ARTICLE VII
## CONFLICTS OF INTEREST

Section 7.1     Business Opportunities.  A Member or Manager shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company.  It is expressly understood that the Member or Manager may enter into transactions that are similar to the transactions into which the Company may enter.

Section 7.2     No Duty.  A Member or Manager does not violate a duty or obligation owed to the Company merely because the Member's or Manager's conduct furthers the Member's or Manager's own interest.  A Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for and transact other business with the Company, and has the same rights and obligations with respect to any such matter as those of a Person who is not a Member or Manager, subject to applicable law.  No transaction with the Company shall be voidable solely because a Member or Manager has a direct or indirect interest in the transaction if the transaction is fair to the Company.

## ARTICLE VIII
## OFFICERS

Section 8.1     Officers.  The Manager may appoint one or more officers or agents of the Company with such titles and authorities as determined by the Manager.  Each such Person shall hold such position until he, she, or it resigns, dies or is removed by the Manager.  The Manager may remove an officer or agent at any time with or without cause.  An officer or agent may resign at any time by giving written notice to the Manager.  The resignation of such officer or agent shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The Company shall reimburse the officers and agents for their reasonable expenses (as determined by the Manager in its sole discretion) incurred in connection with the Company's business.  The officers and agents shall be compensated for their services for such amount and upon such terms and conditions as determined by the Manager from time to time.

## ARTICLE IX
## MANAGEMENT AND AUTHORITY

Section 9.1     Management.  The business and affairs of the Company shall be managed by its Manager.  Except for situations in which the approval of the Member is expressly required

by this Operating Agreement or by non-waivable provisions of applicable law, the Manager shall have full and complete authority, power, and discretion to manage and control the business, affairs and Company Properties, to make all decisions regarding those matters and to perform any and all other acts and activities customary or incident to the management of the Company's business.

Section 9.2     Number, Tenure and Qualifications.  There shall be one Manager, and the Member hereby appoints Caleb Wang as Manager.  The number of managers may be increased or decreased at any time by the Member.  The Manager shall hold office until the Manager's death, resignation, or removal.  The Manager may, but need not be a Member and need not be a resident of Delaware.

Section 9.3     Resignation.  The Manager may resign at any time by giving written notice to the Member.  The resignation of the Manager shall take effect on the effective date of the written notice or at any later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The resignation of the Manager shall not affect the Manager's other rights as a Member and shall not constitute a resignation or withdrawal as a Member.

Section 9.4     Vacancies.  Any vacancy in the office of Manager shall be filled by the Member.

Section 9.5     Limitation of Liability and Indemnification of Manager.

(a)     The Manager will not be liable for the return of any contribution of capital of any Member or for any profits thereon, and any return of capital and profits will be made, if at all, solely from the assets and business of the Company.

(b)     Except as otherwise provided herein, the Manager will not be liable to the Company or the Member for any act or omission in connection with the business or affairs of the Company so long as the Manager acted pursuant to the duties of loyalty and care on behalf of the Company and in a manner reasonably believed by the Manager to be within the scope of authority under this Agreement and in the best interests of the Company, unless such act or omission constitutes gross negligence, reckless conduct, intentional misconduct, fraud or a knowing violation of law.

Section 9.6     Manager Has No Exclusive Duty to Company.  The Manager shall have no exclusive duty to act on behalf of the Company.  The Manager may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in any other investments or activities of the Manager.  The Manager shall not incur any liability to the Company or to the Member as a result of engaging in any other business or venture.

Section 9.7     Right to Rely on the Manager.  Any person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(a)     The identity of any Member;

(b)      The existence or nonexistence of any fact or facts which are germane to the affairs of the Company;

(c)      The persons who are authorized to execute and deliver any instrument or document of the Company; or

(d)      Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

Section 9.8      <u>Removal</u>.   The Manager may be removed at any time with or without cause by the Member.

Section 9.9      <u>Manner of Acting</u>.   The Manager need not act in writing and the affirmative consent (regardless of whether written, oral or by course of conduct) of the Manager shall constitute consent and approval of any action by the Manager for purposes of the Act, except to the extent that a nonwaivable provision of the Act requires that such consent be in writing, in which case the written consent of the Manager shall constitute the consent.

## ARTICLE X
## CONTRIBUTIONS

Section 10.1     <u>Capital Contributions</u>.   The Member may, but shall not be obligated to, make Capital Contributions to the Company.

## ARTICLE XI
## DISTRIBUTIONS

Except to the extent prohibited by the Act or other applicable law, the Manager may make Distributions as determined from time to time.

## ARTICLE XII
## TAXES

Section 12.1     <u>Disregarded Entity</u>.   Under Treasury Regulations promulgated under Section 7701 of the Internal Revenue Code of 1986, as amended, the Company shall be disregarded as an entity separate from the Member for applicable U.S. federal and state tax purposes, such that (among other things) the Company's income, gain, loss and deduction shall be taxable to the Member.

Section 12.2     <u>Elections</u>.   The Manager may make any tax elections for the Company allowed under the Internal Revenue Code of 1986, as amended, or the tax laws of any Taxing Jurisdiction.

Section 12.3     <u>Taxes of Taxing Jurisdictions</u>.   To the extent that the laws of any Taxing Jurisdiction require, the Member shall submit an agreement indicating that the Member shall make timely income tax payments to the Taxing Jurisdiction and that the Member shall accept personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Company's income and interest and penalties assessed on such income by such

Taxing Jurisdiction.  If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, interest and penalty determined under the laws of the Taxing Jurisdiction with respect to such income.  Any such payments with respect to such income shall be treated as a Distribution for purposes of Article XI.

## ARTICLE XIII
## DISPOSITION OF MEMBERSHIP INTEREST
## AND ADMISSION OF ADDITIONAL MEMBERS

Section 13.1   Disposition.  The Member's Membership Interest is transferable either voluntarily or by operation of law, and the Member may Dispose of all or a portion of the Member's Membership Interest.  In the event of the Transfer of less than all of the Member's Membership Interest, the transferee shall be Admitted on such terms and conditions upon which the Member and the transferee may agree.  In the event of the Transfer of the Member's entire Membership Interest, the transferee shall succeed to all the Member's rights under this Operating Agreement and shall be Admitted upon the effectiveness of such Transfer.

Section 13.2   Admission of Additional Members.  The Company may, to the extent and on the terms and conditions determined by the Member, Admit Additional Members and determine the Capital Contributions, rights and duties of such Additional Member.

## ARTICLE XIV
## DISSOLUTION AND WINDING UP

Section 14.1   Dissolution.  The Company shall be dissolved and its affairs wound up at the time determined by the Manager or upon such events as the Act may mandatorily require such.  The death, bankruptcy, dissolution or incompetence of the Member shall not result in the dissolution of the Company.

Section 14.2   Distribution of Assets on Dissolution.  Upon the winding up of the Company, the Company's Property shall be distributed:

a.   First, to creditors, including the Member if it is a creditor (to the extent permitted by applicable law), in satisfaction of the Company's liabilities (whether by payment or the making of reasonable provision for payment thereof); and

b.   Second, to the Member in cash or Property, or partly in both, as determined by the Member.

Section 14.3   Winding Up and Certificate of Cancellation.  The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and a Distribution has been made of all of the remaining Property and assets of the Company.  Upon the dissolution and the completion of the winding up process, the Member shall file such documents, instruments, certificates or articles as may be required by the Act.

**ARTICLE XV**
**AMENDMENT**

This Operating Agreement may be amended or modified from time to time only by a written instrument adopted and executed by the Member.

**ARTICLE XVI**
**INDEMNIFICATION**

Section 16.1    Indemnification of Member, Manager, Employee or Agent:  Proceeding Other Than By Company.  The Company will indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, whether civil, criminal, administrative or investigative, except an action by or in the right of the Company, by reason of the fact that he, she or it is or was a Member, Manager, employee or agent of this Company, or is or was serving at the request of the Company as manager, director, officer, employee or agent of another limited liability company or corporation, against expenses, including attorneys' fees, judgment, fines and amounts paid in settlement actually and reasonably incurred by him, her or it in connection with the action, suit or proceeding if he, she or it acted pursuant to the duties of loyalty and care and in a manner which he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to a criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, does not, of itself, create a presumption that the Person did not act in good faith and in a manner which he, she or it reasonably believed to be in or not opposed to the best interest of the Company, and that, with respect to any criminal action or proceeding, he, she or it had reasonable cause to believe that its conduct was unlawful.

Section 16.2    Indemnification of Member, Manager, Employee or Agent:  Proceeding by Company.  The Company will indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that he, she or it is or was a Member, Manager, employee or agent of this Company, or is or was serving at the request of the Company as a Member, Manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise against expenses, including amounts paid in settlement and attorneys' fees actually and reasonably incurred by him, her or it in connection with the defense or settlement of the actions or suit if he, she or it acted pursuant to the duties of loyalty and care and in a manner which he, she or it reasonably believed to be in or not opposed to the best interests of the Company.  Indemnification may not be made for any claim, issue or matter as to which such a Person has been adjudged by a court of competent jurisdiction, after exhaustion of all appeals therefrom, to be liable to the Company or for amounts paid in settlement to the Company, unless and only to the extent that the court in which the action or suit was brought or other court of competent jurisdiction determines upon application that in view of all the circumstances of the case, the Person is fairly and reasonably entitled to indemnity for such expenses as the court deems proper.

Section 16.3    Indemnity if Successful.  To the extent that a Member, Manager, employee or agent of the Company has been successful on the merits or otherwise in defense of

9

any action, suit or proceeding described in Sections 16.1 or 16.2, or in defense of any claim, issue or matter therein, the Company will indemnify the Member, Manager employee or agent against expenses, including attorneys' fees, actually and reasonably incurred in connection with the defense.

Section 16.4   Expenses.  Any indemnification under Sections 16.1 and 16.2, unless ordered by a court or advanced by the Company, must be made by this Company only as authorized in the specific case upon a determination that indemnification of the Member, Manager, employee or agent is proper in the circumstances.  The determination must be made:

    a.   by the Manager if not party to the act, suit or proceeding; or

    b.   if the Manager was a party to the act, suit or proceeding, the Member.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

Section 17.1   Entire Agreement.   This Operating Agreement represents the entire Operating Agreement governing the relationship between the Member and the Company.

Section 17.2   Rights of Creditors and Third Parties under Operating Agreement.  This Operating Agreement is adopted by the Member for the exclusive benefit of the Company, the Member and their successors and assigns.  Except as expressly set forth herein, this Operating Agreement is not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable law, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and the Member with respect to any Capital Contribution or otherwise.

Section 17.3   Construction.   The word "including" means "including without limitation".

18004203_v1

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of XCJ FT LLC, effective as of the date first set forth above.

**MEMBER:**

WU LIAO, LLC

By: _____
Name: Caleb Wang
Title:  Chief Executive Officer

**EXHIBIT G**

CONTRIBUTION AGREEMENT (HOLDCO)

(*See Attached*)

# CONTRIBUTION AGREEMENT

This CONTRIBUTION AGREEMENT (this "*Agreement*") is effective as of January __, 2022 (the "*Effective Date*") by and between Wu Liao, LLC, a Washington limited liability company (the "*Parent*"), and XCJ FT LLC, a Delaware limited liability company (the "*Subsidiary*").

**WHEREAS**, the Subsidiary is a newly formed Delaware limited liability company;

**WHEREAS**, the Parent desires to contribute, convey, transfer and assign, as a capital contribution, 100% of the membership interests (the "*Contributed Assets*") of The XCJ LLC, a Delaware limited liability company (the "*Company*"), and the Subsidiary desires to acquire and purchase the Contributed Assets from the Parent, on the terms and conditions set forth in this Agreement; and

**WHEREAS**, on the Effective Date, the Subsidiary shall succeed to all of the Parent's liabilities and obligations with respect to the Contributed Assets (collectively, the "*Obligations*"), as well as to all rights, privileges, preferences and goodwill related to the Contributed Assets, including without limitation, the Parent's associated capital accounts, voting and management rights and rights to allocations and distributions under the operating agreement of the Company;

**WHEREAS**, the Parent and the Subsidiary desire and intend that the contribution of the Contributed Assets to the Subsidiary be disregarded for U.S. federal income tax purposes.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      The Parent hereby transfers, assigns, conveys and contributes to the Subsidiary all of the Parent's right, title and interest in the Contributed Assets, effective as of the Effective Date, and the Subsidiary hereby accepts such Contributed Assets and assumes and covenants to perform the Obligations.

2.      The Parent hereby represents and warrants to the Subsidiary that, as of the date hereof, the Parent is the sole owner of all rights, title and interest in and to the Contributed Assets, free and clear of all liens, encumbrances, claims, charges options, security interests, pledges, rights of first refusal, or other restrictions of any kind whatsoever, or otherwise has the full right to provide the Subsidiary with the assignment, rights, and licenses provided herein, including with respect to the Contributed Assets.

3.      The Parent hereby represents and warrants that it has all corporate power to enter into this Agreement and all other agreements and documents contemplated hereby (collectively, the "*Transaction Documents*") and to perform the transactions described in the Transaction Documents.

4.      The execution, delivery and performance of the Transaction Documents have been duly authorized by all necessary corporate or other action of the Parent.

5.      This Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto.

6.      If any provision of this Agreement is held to be illegal, invalid or unenforceable under the present or future laws in effect during the existence of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from Agreement.  Furthermore, in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

7.      The parties hereto shall execute all other certificates, instruments and documents and take all actions as may be reasonably required to effectuate this Agreement.

8.      This Agreement shall be governed in all respects by the internal laws of the State of Delaware, without regard to the conflict of law principles that would apply the laws of another jurisdiction.

9.      This Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto.

10.      This Agreement may be executed in any number of counterparts, each of which, when executed, is deemed to be an original and all of which together are deemed to be one and the same Agreement.  A signature to this Agreement transmitted by facsimile, .pdf or other electronic means is deemed an original and binding upon the party against whom enforcement is sought.

11.      This Agreement contains the entire agreement between the parties with respect to the matters contemplated herein, and supersedes all other prior written or oral negotiations, commitments or understandings with respect to the matters provided for herein.  No amendment or variation of the terms of this Agreement will be valid unless made in writing and executed by the parties hereto.

18002908_2

*(Signature Pages Follow)*

IN WITNESS WHEREOF, each of the undersigned parties has caused this Agreement to be duly executed as of the date first above written.

**WU LIAO, LLC**

By: _____
Name:    Caleb Wang
Title:     Chief Executive Officer

**XCJ FT LLC**

By: _____
Name:    Caleb Wang
Title:     Manager

**EXHIBIT H**

DISTRIBUTION AGREEMENT

(*See Attached*)

## DISTRIBUTION AGREEMENT

This DISTRIBUTION AGREEMENT (this "***Agreement***"), dated as of January __, 2022, is by and among Wu Liao, LLC a Washington limited liability company ("***Parent***"), Caleb Wang ("***Wang***"), Jennifer Liao ("***Liao***"), Norman Wu ("***Wu***"), Brian Yong ("***Yong***") and Danny Brawer ("***Brawer***" and together with Wang, Liao, Wu and Yong, the "***XCJ Founders***").

**WHEREAS**, the XCJ Founders started a direct-to-consumer business that manufactures, packages, ships and sells authentic Asian street food (the "***DTC Business***");

**WHEREAS**, the XCJ Founders have been operating the DTC Business through Parent, although the intent of the XCJ Founders, Parent and Parent's other members was and is that the DTC Business be a separate entity in which Parent's other members have no ownership interest;

**WHEREAS**, the XCJ Founders, Parent and Parent's other members have determined that it is in the best interests of the XCJ Founders, Parent, Parent's other members and the DTC Business to undergo a reorganization following which the DTC Business will be owned and operated by a newly formed entity of which the XCJ Founders are the sole owners (the "***Reorganization***");

**WHEREAS**, on the date hereof, Parent caused to be filed with the Delaware Secretary of State a Certificate of Formation (the "***XCJ Certificate***") pursuant to which The XCJ LLC, a Delaware limited liability company ("***XCJ***") was formed as a Delaware limited liability company (the "***XCJ Formation***");

**WHEREAS**, in connection with the XCJ Formation, Parent contributed the DTC Business to XCJ, as a capital contribution (the "***XCJ Contribution***"), in exchange for 100% of the membership interests in XCJ;

**WHEREAS**, immediately following Parent's filing of the XCJ Certificate, Parent caused to be filed with the Delaware Secretary of State a Certificate of Formation pursuant to which XCJ FT LLC, a Delaware limited liability company (the "***Company***"), was formed as a Delaware limited liability company (the "***Company Formation***");

**WHEREAS**, in connection with the Holdco Formation, Parent contributed 100% of the membership interests in XCJ to the Company as a capital contribution in exchange for 100% of the membership interests in the Company (the "***Membership Interests***");

**WHEREAS**, Parent now desires to distribute to each of the XCJ Founders, and the XCJ Founders desire to accept from Parent, the percentage of Membership Interests set forth opposite his or her name on <u>Exhibit A</u> (the "***Distribution***") in partial liquidation of his or her interest in Parent; and

**WHEREAS**, in view of the XCJ Founders' intention to convert XCJ to a Delaware corporation effective as of the day after the Distribution, Parent and the XCJ Founders desire and intend that the Distribution be treated for U.S. federal income tax purposes as a

distribution to the XCJ Founders of the assets constituting the DTC Business in a transaction governed by Section 731(a) of the Internal Revenue Code of 1986, as amended.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Parent hereby distributes, assigns and transfers, free and clear of all encumbrances (collectively "*Assigns*") to each XCJ Founder the percentage of Membership Interests set forth opposite his or her name on Exhibit A hereto and all of its rights in or connected with such Membership Interests to such XCJ Founder. Parent Assigns the Membership Interests as a distribution of assets in partial liquidation of the XCJ Founders' interest in Parent. Upon such distribution, assignment and transfer, each XCJ Founder is deemed to be the owner of Parent's rights with respect to the percentage of Membership Interests set forth opposite his or her name on Exhibit A hereto. Parent hereby warrants and agrees to defend title to the same against all lawful claims of any party.

2.  Each XCJ Founder hereby accepts the distribution, assignment and transfer of the percentage of Membership Interests set forth opposite his or her name on Exhibit A hereto, and assumes all duties, obligations and liabilities arising in connection with the assigned interests.

3.  Parent hereby represents and warrants to each of the XCJ Founders that Parent has all necessary right and authority to Assign the Membership Interests and effect the Distribution.

4.  This Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto.

5.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under the present or future laws in effect during the existence of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

6.  The parties hereto shall execute all other certificates, instruments and documents and take all actions as may be reasonably required to effectuate this Agreement.

7.  This Agreement shall be governed in all respects by the internal laws of the State of Delaware, without regard to the conflict of law principles that would apply the laws of another jurisdiction.

8.  This Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto.

9.      This Agreement may be executed in any number of counterparts, each of which, when executed, is deemed to be an original and all of which together are deemed to be one and the same Agreement.  A signature to this Agreement transmitted by facsimile, .pdf or other electronic means is deemed an original and binding upon the party against whom enforcement is sought.

10.      This Agreement contains the entire agreement between the parties with respect to the matters contemplated herein, and supersedes all other prior written or oral negotiations, commitments or understandings with respect to the matters provided for herein.  No amendment or variation of the terms of this Agreement will be valid unless made in writing and executed by the parties hereto.

17956953_v3

*(Signature Pages Follow)*

IN WITNESS WHEREOF, each of the undersigned parties has caused this Agreement to be duly executed as of the date first above written.

**PARENT:**

**WU LIAO, LLC**

By: _____
Name: Caleb Wang
Title: Chief Executive Officer

**XCJ FOUNDERS:**

**CALEB WANG**

_____

**JENNIFER LIAO**

_____

**NORMAN WU**

_____

**BRIAN YONG**

_____

**DANNY BRAWER**

_____

**DocuSign**

## Certificate Of Completion

Envelope Id: 8D4CB4B611354452897AABA90823B5FE
Subject: Please DocuSign: Wu Liao - Joint Written Consent (Subsidiary Formations and Distribution)
Source Envelope:
Document Pages: 50
Certificate Pages: 4
AutoNav: Enabled
EnvelopeId Stamping: Disabled
Time Zone: (UTC-07:00) Mountain Time (US & Canada)

Status: Delivered

Signatures: 0
Initials: 0

Envelope Originator:
Paige M. Coriden
555 17th Street Suite 3200
Denver, CO  80202
pmcoriden@hollandhart.com
IP Address: 63.236.112.69

## Record Tracking

Status: Original
    1/6/2022 7:16:52 PM

Holder: Paige M. Coriden
    pmcoriden@hollandhart.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
| --- | --- | --- |
| David Yi | | Sent: 1/6/2022 7:36:24 PM |
| lidavid.yi@gmail.com | | Resent: 1/13/2022 10:01:15 AM |
| Security Level: Email, Account Authentication (None) | | Viewed: 1/13/2022 5:08:21 PM |
| **Electronic Record and Signature Disclosure:** | | |
|   Accepted: 1/13/2022 5:08:21 PM | | |
|   ID: 86801d7d-1695-41da-96b1-12ae01636b17 | | |

| In Person Signer Events | Signature | Timestamp |
| --- | --- | --- |

| Editor Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Agent Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Intermediary Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Certified Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |

| Witness Events | Signature | Timestamp |
| --- | --- | --- |

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 1/6/2022 7:36:24 PM |
| Certified Delivered | Security Checked | 1/13/2022 5:08:21 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

## Electronic Record and Signature Disclosure

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Holland and Hart LLP (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Holland and Hart LLP:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: ejohnson@hollandhart.com


**To advise Holland and Hart LLP of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at ejohnson@hollandhart.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from Holland and Hart LLP**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to ejohnson@hollandhart.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Holland and Hart LLP**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to ejohnson@hollandhart.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Holland and Hart LLP as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Holland and Hart LLP during the course of my relationship with you.